Penny FERRIS, Plaintiff–Appellant,

v.

DELTA AIR LINES, INC., Defendant–Appellee,

and

Michael Young, Defendant.

Docket No. 00–7921.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 2001.

Decided Dec. 21, 2001.

Allegra Fishel, Beranbaum Menken Ben–Asher & Fishel LLP, New York, NY (John A. Beranbaum on the brief), for Plaintiff–Appellant.

Gilmore F. Diekmann, Jr., Seyfarth Shaw, San Francisco, CA (Lisa Barnett Sween on the brief), for Defendant–Appellee.

Before: VAN GRAAFEILAND, NEWMAN, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge.

Plaintiff Penny Ferris, a flight attendant employed by defendant Delta Air Lines ("Delta"), appeals from a grant of summary judgment by the United States District Court for the Eastern District of New York (Weinstein, *J.*), dismissing her claims for (1) sexual harassment under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107, and (2) numerous other torts under the law of New York, including negligent hiring, retention, and supervision of an employee; assault, battery, false imprisonment, and intentional infliction of emotional distress. The suit arises from a male flight attendant's rape of Ferris during the crew's brief layover between flights in Rome. We vacate the grant of summary judgment as to the federal sexual harassment claims because a reasonable factfinder could find that Delta was responsible for a sexually hostile work environment that caused injury to Ferris. We affirm the grant of summary judgment as to the claims under New York State and New York City law.

## BACKGROUND

A. *Events giving rise to this lawsuit.*

In reviewing a grant of summary judgment in favor of the defendant, we are

obligated to consider all facts in the light most favorable to the plaintiff. They are as follows:

### 1. *Young's rape of Ferris*

In March 1998, Penny Ferris and Michael Young, both Delta flight attendants, were employed together on the crew of a Delta flight from New York City to Rome, Italy. When the flight arrived in Rome on March 17, the crew (including Ferris and Young) boarded a Delta bus to be driven to the Savoy Hotel, where Delta had reserved and paid for a block of rooms to be used by the crew until their return flight to New York on March 18. That afternoon, Ferris and Young had shopped together for wine for Ferris to bring home as a present. Young told her he had brought a bottle of a vintage Ferris was considering and offered to let her taste it in his room when they returned to the hotel. Upon their return, Ferris went to Young's room, where he had a glass of wine ready for her. After drinking about half a glass, Ferris felt faint. She tried to return to her room, but could not make her legs move. She blacked out. While she was unconscious, Young took off her clothes and raped her vaginally, orally, and anally. She partially regained consciousness intermittently during the multiple rapes, at one point telling Young to stop before blacking out again.

That night, at dinner with the other flight attendants, Ferris was in shock and confusion. During the dinner, she began to feel nauseous, and went to the bathroom and vomited. The following day, she flew back to New York, serving as crew together with Young.

On March 30, 1998—about two weeks after the rape—Ferris recounted what had happened to Vanessa Bray, who had been the "On Board Leader" (the lead flight attendant) on the March 16–18 flights.

She told Bray that she thought that she might have been drugged because she was unable to do anything about what was happening to her. Ferris then asked Bray not to repeat what she had said, and Bray did not.

On April 11, 1998—about three weeks after the rape—Ferris reported the rape to Anne Estall, the Delta Duty Supervisor. In the course of a one-hour meeting, Ferris informed her that she had been raped by a flight attendant who was an Italian speaker on a March 1998 flight to Rome. Ferris refused to give Young's name. Using the Delta computer system, Estall narrowed the suspects down to two male, Italian-speaking flight attendants who had been on the March 16–18 flights. She then set up a meeting between Ferris and Maritza Biscaino, the Delta Base Manager at John F. Kennedy International Airport (JFK) for six days later.

At the meeting on April 17, 1998, Ferris told Biscaino about the rape in an interview that lasted approximately two hours. Biscaino requested a written report and the rapist's name, both of which Ferris refused to give her. In follow-up conversations with Ferris around May 4, 1998, Biscaino eventually persuaded Ferris to disclose her assailant's name.

On May 5, 1998, Biscaino and her co-base-manager Kevin Grimes interviewed Michael Young for approximately two hours. He said that, upon arriving in Rome, he had gone to the gym, returned to his room for a nap, and spent the night with another flight attendant, Jaycee Kantz. The same day, he provided a written statement to this effect. Biscaino interviewed Kantz shortly after, and Kantz confirmed that Young had spent the night with her.

Sometime in early June 1998, flight attendant Carolyn Gordon overheard a conversation between Young and another

flight attendant in which Young said that he had been accused of drugging and raping a Delta flight attendant. This prompted Gordon to handwrite a memo to Delta on June 22, 1998, which recounted an experience that Gordon had had with Young in December, 1997. Gordon had accepted Young's invitation to come to his room during a layover in Rome for a glass of wine. When she got there, two glasses of wine were already poured on the nightstand. Gordon's memo implied that the wine Young gave her may have been drugged and that he took advantage of her drugged state to have sex with her, although she acknowledged that she may have suffered an adverse reaction between the wine and anti-depressant medications she had been taking.

On June 25, 1998, Ferris gave Biscaino her first written report of the incident. Ferris's written report repeated the events as previously recounted to Vanessa Bray, Estall, and Biscaino. On June 29, 1998, Biscaino and Grimes again met with Young, confronting him with the information in Ferris's written report.[1] At the conclusion of the meeting, Biscaino and Grimes suspended Young and removed his Delta workplace identification. Delta continued to investigate Ferris's claims over the next several months, while Young was on suspension. Young refused to cooperate with the investigation, and was recommended for termination on November 5, 1998. At some point, Young submitted a handwritten resignation to Delta.

2. *Delta's prior notice of Young's sexually abusive conduct with co-workers*

a. *Kathleen Ballweg*

At Christmas time, 1993, Kathleen Ballweg and Young were flight attendants to-

gether on a Delta flight from New York to Milan. During the flight, Young invited several flight attendants to accompany him to see the Christmas Eve service in Florence. Several agreed, but changed their minds by the time the plane arrived in Florence, leaving Ballweg as the only flight attendant accompanying Young to Florence. Young raped Ballweg in her hotel room in Florence.

Upon returning to the United States, Ballweg reported the incident to a Delta supervisor at JFK. She said the supervisor should know about somebody who is potentially dangerous, and she identified Young by name. Although she believed she did not use the word "rape," she told the supervisor that she had been attacked, and clearly communicated that the attack was sexual in nature. She told the supervisor that she wanted to be anonymous, and the supervisor replied that Delta could do nothing about it unless Ballweg made a written, formal complaint, which Ballweg did not want to do. Ballweg told the supervisor that she would spread the word about Young's dangerousness, and later warned many flight attendants about Young.

Ballweg later encountered Young during a Delta layover in Frankfurt. Young called Ballweg several times in her hotel room that night, saying she should spend the night with him, and berating her with comments about sex. Ballweg again reported her experiences with Young to a Delta supervisor. She told the supervisor about the attack in Florence, noted that she had already told a supervisor about it, and told the supervisor that she thought that Young was still dangerous.

---

1. The written report stated that the rape occurred in the afternoon. Biscaino and Grimes seem to have thought that Ferris had stated that she was raped in the evening, so that Kantz could provide Young with an alibi. However, Ferris was virtually certain that she had told Biscaino in her initial interview that the rape had occurred during the afternoon.

Ballweg flew with Young only one more time after the phone calls in Frankfurt. Whenever she was flying to Rome or Milan, she would check the flight attendant list to see if Young was on the flight, and tried to avoid assignment to a flight if she saw that Young would be working on it.

Delta took no action in response to Ballweg's reports.

### b. *Aileen Feingold*

In March 1995, Delta flight attendant Aileen Feingold visited Young in Dallas for sightseeing. Young had invited her to stay at his house, telling her she would have a separate bedroom. On the night that Feingold spent at Young's house, Young entered the bedroom where she was sleeping and raped her while she was asleep.

Feingold was so distraught after the rape that she failed a training test that she took the next day. Delta subsequently cancelled one of Feingold's scheduled trips so that she could re-take the test.

Feingold later warned several Delta flight attendants that Young was a rapist. About four months after the rape, Feingold contacted Young about a suitcase that she had left at his house. Young emailed her, telling her that it was her problem to take care of her things, that he had heard that she was talking negatively about him, and that she had better stop because Young had friends that could get her in a lot of trouble, specifically mentioning Delta supervisor Nancy Ruhl, who was manager of in-flight service for JFK. Young also left messages at her home, telling her to shut her mouth, or he would take care of her.

Feingold then contacted Ruhl, the Delta supervisor that Young had mentioned. Feingold told Ruhl about the rape. Feingold also read Ruhl the emails that she had received, and offered to bring her file

of Young's emails by Ruhl's office. Ruhl said that that would not be necessary. Feingold said that she believed she was not the first person that Young had raped, as it seemed to her that Young had a method of operation that was down pat. Feingold offered to write up a report to put in Young's file to document her allegations. She told Ruhl that she wanted to do something so that Young would not rape anyone else. Ruhl told Feingold that she would talk to Young and that she would take care of the situation, and that it was not necessary for Feingold to provide a written report.

The next day, Ruhl called Feingold and told her that she had talked to Young, that he would not bother her again, and that she had taken care of everything. She instructed Feingold never to talk to Young, and not to talk to anyone about what had happened.

Delta took no action in response to Feingold's report.

### 3. *Michelle Zachry*

Michelle Zachry, another Delta flight attendant, had also reported to Delta that Young had behaved hostilely and aggressively toward her during their work on a flight after she refused to go out to dinner with him.

Zachry flew with Young to Rome in July 1997. During the flight, Young made sexual comments to her, told her about his illegal steroid use, told her that he was involved in a sexual affair with another flight attendant, and invited Zachry to go to dinner. Later, Young called Zachry in her hotel room to ask her to go to dinner, and after she turned him down, called her back and became belligerent.

After landing from the return flight from Rome, Young came up to Zachry and began cursing and screaming at her. Pas-

sengers turned around to look at him, and another flight attendant eventually interposed himself between Young and Zachry and told Young that he needed to "chill out."

Zachry reported this incident to a supervisor. She did not give Young's name, but told the supervisor that a flight attendant had gone crazy because she would not go out to dinner with him. The supervisor did not ask any questions of her, and did not make a formal report.

In the meantime, Zachry had spoken with the flight attendant that Young had said he was having an affair with. About one week later, Zachry encountered Young on a Delta tram in the Dallas airport. Young called Zachry obscene names, and threatened to kill her. Zachry feared that Young might physically attack her.

After the incident on the tram, Zachry told Cheryl Merit, a Delta supervisor, that she was going to report an incident. Merit then accompanied Zachry to the office of Kathy Goldberger, a Delta supervisor. This time, Zachry identified Michael Young by name, and told Goldberger what had happened on the plane, on the tram, and how Young had boasted of his illegal steroid use. Goldberger asked Zachry to make a written report, telling her that they could not do anything unless Zachry made a written report, and Goldberger told Zachry that Delta "[did not] have anything on [Young]." Zachry was not willing to make a written report. Afterwards, Zachry would not fly to Rome because of her fear of encountering Michael Young.

Delta took no action in response to Zachry's report.

## B. *The district court's decision*

In July 1999, Ferris brought this action against Young· and Delta. Judge Wein-

stein ordered a separate initial trial on the question whether the rape had occurred. This resulted in a mistrial when the jury was unable to agree on a verdict. Delta then moved for summary judgment. The court rejected plaintiff's sexual harassment claims. *See P. v. Delta Air Lines, Inc.,* 102 F.Supp.2d 132 (E.D.N.Y.2000) (hereinafter *"P."*). With respect to the rape itself, the court ruled that Ferris could not prevail because Young's hotel room in Rome was not a "work environment" within the ambit of Title VII. *See id.* at 141. As to the claim based on Ferris's anxiety and distress at the prospect of thereafter encountering Young at Delta, the court concluded that plaintiff's claimed injury was too hypothetical and speculative to support a claim of hostile work environment harassment. *See id.* at 142–43.

The court also rejected plaintiff's state tort claims. Plaintiff has not sought review of most of these rulings. On the claims for negligent retention and supervision, which plaintiff has pursued on appeal, the district court concluded that Delta could not be held liable for Young's actions because Young was not on Delta's premises or using Delta's chattels when he raped plaintiff. *See id.* at 144.

Judgment was entered on July 20, 2000. On this appeal, Ferris argues the district court erred in granting summary judgment to Delta on her sexual harassment claim and on her claims for negligent supervision and retention of Young.

## DISCUSSION

### A. *Sexual harassment claims*

#### 1. *Young's rape of Ferris during the layover in Rome*

The district court granted summary judgment to Delta on Ferris's claim based on the rape in Rome. Because Young had no supervisory authority over Ferris and

she associated voluntarily with him, and there was no evidence that Delta had affirmatively encouraged flight attendants to visit each other's rooms, the court concluded that the attack in Young's hotel room could not, as a matter of law, be found to have occurred in a "work environment." *See P.*, 102 F.Supp.2d at 141.

■ Although we think the question is close, we respectfully disagree with the district court's conclusion. In our view, the rape could be found to have occurred in a work environment within the meaning of Title VII. The circumstances that surround the lodging of an airline's flight crew during a brief layover in a foreign country in a block of hotel rooms booked and paid for by the employer are very different from those that arise when stationary employees go home at the close of their normal workday. The flight crew members repeatedly spend brief layovers in a foreign country with little opportunity to develop private lives in that place. Most likely they do not speak the local language. In all likelihood, they do not have family, friends, or their own residences there. Although it is not mandatory for them to do so, they generally stay in a block of hotel rooms that the airline reserves for them and pays for. The airline in addition provides them as a group with ground transportation by van from the airport to the hotel on arrival, and back at the time for departure. It is likely furthermore in those circumstances that the crew members will have no other acquaintances in this foreign place and will band together for society and socialize as a matter of course in one another's hotel rooms. Even though the employer does not direct its employees as to how to spend their off-duty hours, the circumstances of the employment tend to compel these results. In view of the special set of circumstances that surround such a foreign layover, we disagree with the district court's conclusion. A jury could properly find on these facts that Young's hotel room was a part of Ferris's work environment within the terms of Title VII.[2]

■ The Supreme Court has stated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is

---

2. We recognize that cases that have found or implied that sexually abusive conduct *committed by supervisors* away from the place of employment can sustain employer liability depend at least in part on a significantly different theory. *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 748, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (plaintiff's allegations of harassment included an allegation that while she and a supervisor were on a business trip, the supervisor had invited her to the hotel lounge, made remarks about her breasts, and, when she gave no encouragement to him, told her to "loosen up" and warned her, "I could make your life very hard or very easy at Burlington."); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 60, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (plaintiff's allegations of harassment included allegations that her supervisor had invited her out to dinner and, at the dinner, suggested that they go to a motel and have sexual relations and that her supervisor had made repeated demands upon her for sexual favors, both during and after business hours); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1301–02 (2d Cir.1995) (plaintiff's allegations of harassment included an allegation that plaintiff had gone out for a "business dinner" with two supervisors and a co-worker that consisted of having about 40 drinks and a small quantity of food at a bar, after which the three men raped her in the back seat of a rental car), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *McGuinn–Rowe v. Foster's Daily Democrat*, 1997 WL 669965, at *3 (D.N.H.1997); *Enders v. Associated Co., Inc.*, 1995 WL 580052, at *2, 1995 U.S. Dist. LEXIS 14525, at *5 (D.Kan.1995); *Huitt v. Market St. Hotel Corp.*, 1993 WL 245744 (D.Kan.1993).

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A plaintiff establishes a claim for hostile environment sexual harassment if she demonstrates (1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment, and (2) a sufficient basis for imputing the conduct that created the hostile environment to her employer. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997).

 Although a continuing pattern of hostile or abusive behavior is ordinarily required to establish a hostile environment, a single instance can suffice when it is sufficiently egregious. We have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 Ferris's evidence must also satisfy the second prong by showing a sufficient basis for imputing responsibility to Delta for Young's conduct. Where the harassment was done by a co-employee without supervisory authority over the plaintiff, liability will be imputed to the employer "only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 441 (2d Cir.1999) (internal quotation marks omitted); *see Faragher v. City of Boca Raton,* 524 U.S. 775, 799, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting agreement among the circuits that liability should be imputed to employers in cases of co-worker harassment only if the employer was negligent).

 A reasonable factfinder might conclude that Delta's negligence made it responsible for Ferris's rape. Delta had notice of Young's proclivity to rape co-workers. The fact that Young's prior rapes were not of Ferris but of other co-workers is not preclusive. If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees.

Supervisory personnel at Delta had been notified that Young had twice raped female co-workers and had engaged in other abusive, sexually hostile conduct toward the rape victims and a third co-worker. Not only did Delta do nothing about it, but a Delta supervisor (Ruhl) took affirmative steps to prevent the filing of a formal complaint that might have resulted in protective steps and even to prevent a prior victim (Feingold) from informally spreading cautionary words among the flight attendants about Young. Given all the circumstances, a reasonable factfinder could find that Delta was negligent in failing to take steps that might have protected Ferris from Young's proclivity to rape female co-workers.

 The district court rejected the proposition that the Ballweg and Feingold rapes could constitute notice to Delta as to the harassment Ferris suffered. It reasoned that the "[e]arlier complaints of

sexual improprieties involved non-work-related, off-duty encounters, substantially curtailing both the practical ability and the legal authority of Delta to investigate." *P.*, 102 F.Supp.2d at 142. We disagree. Had the earlier non-work related incidents consisted of less grave conduct, such as off-duty flirtation, sexual innuendo, or crude talk, we might agree that such off-premises, off-duty conduct does not reasonably give notice of a likelihood that the person will represent a danger to co-employees or import his harassment into a work environment and therefore does not give rise to an employer's duty to protect co-workers. But rape is obviously a far more serious matter. The more egregious the abuse and the more serious the threat of which the employer has notice, the more the employer will be required under a standard of reasonable care to take steps for the protection of likely future victims. The district court may have been correct that Delta's ability to investigate was curtailed by the fact that the Feingold and Ballweg rapes occurred off-duty. It does not follow, however, that the off-duty nature of the rapes absolved Delta of all responsibility to take reasonable care to protect co-workers, much less justified a supervisor's affirmative steps to prevent a victim from filing a written complaint and warning co-workers.

2. *Ferris's subsequent distress at the prospect of encountering Young at Delta once she was back in New York.*

█ Because Ferris did not work with Young again after their return to New York, the district court granted summary judgment to Delta with respect to Ferris's fear of further encounters with Young on the ground that "such trepidation, standing alone, is too hypothetical and speculative to support a contention that there was an 'objectively hostile or abusive work en-

vironment.'" *P.*, 102 F.Supp.2d at 142. We think the evidence, viewed in the light most favorable to Ferris, showed that she suffered real emotional trauma from her fear of seeing Young again while both were working as flight attendants. Ferris endeavored to keep abreast of Young's work schedule in efforts to ensure that she would not ever work on a flight he was on. But she suffered anxiety attacks at work due to her fear that she might again encounter Young, sought psychiatric help and took antidepressants. Under the circumstances, we do not think that Ferris's fear of encountering her rapist at her workplace is too hypothetical and speculative to sustain an award of damages. We do not rule out, however, that Ferris may be chargeable with partial, or even full, responsibility for this later injury or its duration by reason of her failure to mitigate her damages when she delayed reporting the event to Delta and naming her assailant.

B. *New York negligent retention and supervision claims*

Ferris originally brought claims against Delta for various intentional torts under the doctrine of respondeat superior, as well as claims for negligent hiring, retention, and supervision. The district court granted summary judgment for Delta on all of Ferris's state tort claims. *See P.*, 102 F.Supp.2d at 143–44. On appeal, Ferris pursues only her negligent retention and supervision claims.

The district court granted summary judgment for Delta on Ferris's negligent retention and supervision claims on the grounds that employers are only liable for the torts of negligent retention and supervision when the torts are committed on the employer's premises or with the employer's chattels, and that the hotel room in

Rome was neither Delta's premises nor its equipment. *P.*, 102 F.Supp.2d at 143–44.

 We affirm the grant of judgment by reason of the New York's Workers' Compensation statute. It provides that: "The right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee ... when such employee is injured ... by the negligence or wrong of another in the same employ...." N.Y. Workers' Comp. Law § 29(6) (McKinney 1993 & Supp.2001), *see also* N.Y. Workers' Comp. Law § 11 (McKinney 1993 & Supp.2001). We held in *Torres v. Pisano*, 116 F.3d 625 (2d Cir.1997), that the New York Workers' Compensation Law barred a common law negligence claim that was asserted on the basis of an alleged hostile work environment because of co-worker harassment. *Id.* at 640. Ferris's state common law negligence claims are therefore precluded by the exclusive remedy provisions of New York's Workers' Compensation statute. *See id.; see also Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 533 (S.D.N.Y.1998) (dismissing New York common law negligence claims arising out of sexual harassment lawsuit as barred by exclusive remedy provisions of New York Workers' Compensation Law), *Burlew v. Am. Mut. Ins. Co.*, 63 N.Y.2d 412, 482 N.Y.S.2d 720, 472 N.E.2d 682 (1984). We therefore affirm the district court's grant of summary judgment on Ferris's negligent retention and supervision claims.

## CONCLUSION

The district court's grant of summary judgment in Delta's favor as to Ferris's federal sexual harassment claims is vacated and the case remanded for further proceedings. The district court's grant of summary judgment in Delta's favor as to Ferris's state law claims for negligent retention and supervision is affirmed. The award of costs and disbursements to Delta is vacated. The costs of the appeal are awarded to Ferris.