**Maria PARKER, Plaintiff,**

v.

**OLYMPUS HEALTH CARE, INC. dba Advantage Health Care, Heritage Management, Inc., and Heritage Management II, Inc. dba Advantage Health Care, Defendants.**

No. 2:00–CV–00626 PGC.

United States District Court,
D. Utah,
Central Division.

May 29, 2003.

Brent Gordon, Driggs, Bills & Day, Salt Lake City, UT, Mr. Erik Strindberg, Lauren I. Scholnick, April L. Hollingsworth,

Strindberg & Scholnick, Salt Lake City, UT, for plaintiff.

James E. Ellsworth, Jon E. Waddoups, Katherine Lynn Hudman, Kirton & McConkie, Salt Lake City, UT, W. Mark Gavre, Mr. Raymond J. Etcheverry, Parsons, Behle & Latimer, Salt Lake City, UT, Susie I Hindley, Brent E. Johnson, Reha Kamas Deal, Bryan K. Benard, Holland & Hart, for defendant.

## ORDER DENYING MOTION FOR A NEW TRIAL AND GRANTING IN PART MOTION FOR ATTORNEYS' FEES

CASSELL, District Judge.

Before the court is defendants' motion for a new trial [Doc. # 153–1] and plaintiff's motion for attorneys' fees and costs [Doc. # 158–1 and Doc. # 172–1]. For the reasons explained below, the court DENIES defendants' motion for new trial and GRANTS in part plaintiff's motions for fees and costs.

### Factual Background

This is a sexual harassment case of a particularly egregious nature. The plaintiff, Ms. Parker, alleged that she was raped by defendants' employee, Mr. White, and that the defendants are liable for the rape because, among other things, they knew or should have known that Mr. White had previously raped and sexually assaulted other subordinate employees. Specifically, at the trial, Ms. Parker presented evidence that before Mr. White raped her, he had raped and sexually assaulted four other female employees at one of the defendants' health care facilities, the Advantage facility. The court will identify these women by their initials to protect their privacy. First, Ms. Parker submitted evidence that when Mr. White learned that his subordinate, A.D.A., was sick, he took her to a room where she could lie down, then shortly returned to that room, pinned her down, and raped her.[1] A.D.A. testified that after the incident, she told Brenda Anderegg, defendants' Director of Nursing, that "Jim was very sexually inappropriate."[2] Second, S.S.M., a seventeen year old woman at the relevant time, testified that during her shift Mr. White "pinned [her] down on the bed" and raped her.[3] S.S.M. testified that she reported the incident to Paul Ogilvie, the Administrator of defendants' Advantage facility.[4] Third, J.H. testified that Mr. White would follow her into patients' rooms, take her inside the bathroom, close the door and have unwanted sex with her.[5] Fourth and finally, A.F.R. testified that Mr. White forcibly kissed her and "tried to pull down [her] pants while they were in his office."[6] The testimony provided by these women was emotional and, to the court's mind, quite credible.

In this lawsuit, Ms. Parker alleged that she was raped by Mr. White in an off-site apartment during her lunch break. She testified that Mr. White, her supervisor, coerced her into going to his apartment by denying her a chance to go anywhere else for lunch. After working a full eight-hour shift, she needed food before resuming a second eight-hour shift. She followed Mr. White to his apartment, where she was attacked without warning.

On December 16, 2002, the jury found that Mr. White had sexually harassed Ms.

---

1. *See* Transcript of Trial Testimony of A.D.A. at 16.

2. *See id.* at 18.

3. *See id.* at 58–59.

4. *See id.* at 59–60.

5. *See* Transcript of Trial Testimony of J.H. at 7–9.

6. *See* Transcript of Trial Testimony of A.F.R. at 10.

Parker and that the defendants were liable under both the supervisor and non-supervisor theories of Title VII. The jury awarded extensive damages: $750,000 in compensatory damages and $1,750,000 in punitive damages. Without objection from Ms. Parker, this award was reduced to $300,000 based on the statutory damage caps found in Title VII.[7]

### · Motion for a New Trial

Defendants ask the court to grant a new trial in this matter on two grounds: (1) that the court erred in allowing the jury to draw an adverse inference against the defendants when James White, a non-party, asserted the Fifth Amendment privilege; and (2) that the jury instructions regarding the "non-supervisor" standard of liability was reversible error.

#### Mr. White's Invocation of the Fifth Amendment

■ The issue of an adverse inference based on Mr. White's invocation of the Fifth Amendment was addressed in the court's December 2, 2002 memorandum opinion. For the reasons stated there, the court denies defendants' motion. Indeed, based on events at trial, the court is even more firmly convinced that an adverse inference against the defendants was proper.

It is appropriate, first, to note how the defendants proposed to handle Mr. White. They sought to have Mr. White invoke his Fifth Amendment privilege outside the presence of the jury and then preclude questioning about the subjects over which he was asserting privilege—i.e., his interactions with the various women who testified at trial. This approach would have been highly confusing to the jury, who would have heard Mr. White testify about such things as the administrative layout of the defendants' offices, but not his interactions with the various women. Indeed, the jury might well have drawn an adverse

inference against Ms. Parker in such circumstances, as they might have concluded that she was choosing not to raise such subjects. It is important to remember that Ms. Parker, like all Title VII plaintiffs, bore the burden of proving her case.

Rather than follow this approach, the court allowed Ms. Parker's counsel to raise limited questions with Mr. White concerning his interactions with the women. Mr. White chose to invoke his Fifth Amendment right to decline to answer those questions. The court then *permitted,* but did not require, the jury to draw an adverse inference against the defendants. The court is convinced that such an inference, if the jury chose to draw it, was trustworthy in these circumstances. Among other things, the evidence presented by Ms. Parker at trial fully confirmed that the defendants, in choosing to make Mr. White a supervisor, had vested in him control over key facts involved in this litigation. The trial evidence also plainly demonstrated that the interests of Mr. White and defendants were completely aligned. The defendants took the position that Mr. White's interactions with Ms. Parker were all fully voluntary. While Mr. White asserted his Fifth Amendment privilege on such questions, the vehement manner in which he invoked his rights and side interjections in doing so made it clear to the jury that, if he had answered, he would have said the same thing—although he was not willing to be cross-examined about his activities. Finally, Ms. Parker presented compelling evidence from a number of women that they had been sexually assaulted by Mr. White.

For all these reasons, an inference was appropriate. But, in any event, the adverse inference was only a minor part of Ms. Parker's case. Accordingly, defendants' motion for a new trial based on the

---

7. *See* Order Granting Motion for Remittitur of     April 10, 2003.

alleged error in permitting an adverse inference will be denied.

*Jury Instruction on Previous Attacks*

The court also denies defendants' motion based on the jury instruction issue. In jury instruction No. 27, the court stated, in part, that:

> To hold Plaintiff's employer liable, Plaintiff has the burden to prove by a preponderance of evidence that Plaintiff's employer was itself negligent because:
>
> 1.  Plaintiff's employer actually knew, or in the exercise of reasonable care should have known, *Mr. White's alleged sexual harassment;* and
>
> 2.  It failed to employ remedial or preventative action reasonably calculated *to end and prevent* Mr. White's alleged sexual harassment of Plaintiff.[8]

Defendants object to the italicized language, and similar language appearing in instruction numbers 28 and 29, and assert that the proper instruction would state that:

> To hold Plaintiff's employer liable, Plaintiff has the burden to prove by a preponderance of evidence that Plaintiff's employer was itself negligent because:
>
> 1.  Plaintiff's employer actually knew, or in the exercise of reasonable care should have known of, *Mr. White's alleged sexual harassment of Plaintiff;* and
>
> 2.  It failed to employ remedial or preventative action reasonably calculated *to end Mr. White's sexual harassment of Plaintiff.*[9]

Defendants' argument is that "under the non-supervisor theory of liability, the employer must know, or in the exercise of

reasonable care should have known, of the perpetrator's alleged harassment of Plaintiff—*not* just generally of the perpetrator's alleged harassment of any kind and of any person."[10] Further, defendants argue that regarding numbered paragraph two, the standard either should be that defendants failed to "end the harassment" (not to prevent it) or at a minimum should be stated in the disjunctive ("end *or* prevent") rather than the conjunctive ("end *and* prevent").[11]

■ The court denies defendants' motion on this issue for two reasons. First, even if the instruction on non-supervisory liability was in error, the error did not prejudice the defendants. The jury found that defendants were liable to Parker on two independent theories of liability: supervisory and non-supervisory. Therefore, if the non-supervisory instruction was inaccurate, the damage award is still fully supported by the jury's finding of liability based on a theory of supervisory liability. Ms. Parker presented ample evidence that would support the jury's finding that Mr. White was a supervisor. Accordingly, the jury instruction issue, while academically interesting, does not have any real bearing on the outcome of this case.

■ Second, even on a non-supervisory theory, the court concludes that the instructions were a proper statement of the law in light of Ms. Parker's unique allegations and the significant evidence that defendants knew or should have known that Mr. White was a sexual predator who had raped and/or harassed multiple women before Ms. Parker. The court acknowledges that in many Title VII cases, non-supervisory liability only attaches when the em-

---

**8.**  *See* Jury Instruction 27 (emphasis added).

**9.**  *See* Defendants' Proposed Jury Instructions, Instruction No. 24 (emphasis added).

**10.**  *See* Memorandum in Support of Defendants' Motion for a New Trial ("Memo in Support") at 3.

**11.**  *See id.*

ployer knew or should have known of the harassment of the particular plaintiff. That rule may work well in normal Title VII litigation. This case, however, was no normal Title VII matter. To the contrary, it involved a plaintiff's claim that an employer was aware of a sexual predator on its staff and did not nothing to stop him. In this specialized context, it would make no sense to apply a standard allowing an employer to escape liability because of the fortuity that the predator attacked his victims serially rather than repeatedly. This would be an unsupportable interpretation of sexual harassment law.

In reaching this conclusion, the court finds the three cases cited by defendants quite distinguishable. First, in *Burlington Industries, Inc. v. Ellerth*,[12] the Supreme Court was faced with a plaintiff who alleged that her supervisor repeatedly made sexual advances toward her and harassed her.[13] In that opinion, the Court said: "An employer is negligent with respect to sexual harassment if it knew or should have known about *the conduct* and failed to stop it."[14] Pointing to the italicized language, defendants contend that the conduct at issue there was conduct aimed at the plaintiff. The court finds this case readily distinguishable for two reasons. First, it dealt with a different theory of liability—supervisor liability instead of the non-supervisory liability at issue in the jury instruction. Second and more important, there is no indication that the plaintiff in *Burlington* had alleged harassment of more than one victim. Thus, the court had no occasion to provide guidance on the situation here: a perpetrator with multiple victims.

Second, in *Adler v. Wal–Mart Stores, Inc.*,[15] the Tenth Circuit held that an employer was not liable for a string of sexually harassing behaviors directed against a single victim where the employer adequately stopped the harassment.[16] The Tenth Circuit found that "all known harassment ... stopped as a result of Wal–Mart's remedial and preventative actions."[17] Thus, this case is distinguishable on three grounds. First, the conduct was less egregious than the rape alleged here; second, the allegations only involved a single victim so the Circuit did not have opportunity to address the standard when multiple victims are involved; and third, the Circuit specifically found that the company was not liable because—unlike this case—the employer promptly and effectively stopped the harassment.[18]

Finally, the defendants cite *Hollins v. Delta Airlines*,[19] where the Tenth Circuit held that an employer was not liable for racially harassing behavior by plaintiff's co-workers where the employer adequately remedied the situation.[20] The Circuit held that Delta was not liable because whenever Delta "was presented with a potentially harassing situation, it immediately investigated, took corrective action, and disciplined any offending employees."[21] Thus, this case is distinguishable for the same reasons as in *Adler*: it involves less egregious conduct, with only one victim, and the Circuit found that the employer took

---

12. 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

13. *See id.* at 747, 118 S.Ct. 2257.

14. *Id.* at 759, 118 S.Ct. 2257.

15. 144 F.3d 664 (10th Cir.1998).

16. *See id.* at 678.

17. *Id.*

18. *See id.* at 676–77.

19. 238 F.3d 1255 (10th Cir.2001).

20. *See id.* at 1259.

21. *Id.*

all reasonable steps and stopped the harassing behavior.

While neither the defendants nor the court have located law in this circuit that addresses the unique allegations and concerns of this case, the Second Circuit has dealt with a similar case. In *Ferris v. Delta Air Lines, Inc.*,[22] the plaintiff alleged that she was raped by a co-worker, and that the same perpetrator had raped other co-workers before he raped her.[23] The Second Circuit reversed summary judgment in favor of the employer and held that where an employer knew or should have known of the harasser's penchant for sexual harassment, the employer is liable for future harassment if it fails to adequately protect future victims.[24] The Second Circuit reasoned:

> The fact that [the perpetrator's] prior rapes were not of [plaintiff] but of other co-workers is not preclusive. If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees.[25]

The court adopts the holding and the reasoning of the Second Circuit, and concludes that under the circumstances of this case, the jury could find that the defendants were liable for failing to adequately protect Ms. Parker. Ms. Parker presented ample evidence from which a reason-

able jury could conclude that the defendants in fact knew they had on staff a sexual predator. Just as "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability,"[26] a single assault that was known to the employer can create a duty under Title VII to prevent subsequent attacks. Accordingly, the court finds that the jury was properly instructed on the law, and DENIES defendants' motion for a new trial.

### Motion for Attorneys' Fees and Costs

Ms. Parker asks the court to grant her $214,417.17 in attorneys' fees and costs ($205,801.95 in her original request and $8,615.22 in supplemental fees), and to augment this award by twenty-five percent (25 %) based on the risk involved and the result achieved.[27] Defendants oppose the motion and specifically dispute eighty-six (86) entries of fees and costs.[28] For the reasons explained below, the court GRANTS Ms. Parker's motion in part, and awards her $208,182.67 in attorneys' fees and costs. Further, the court grants the motion to augment this award by twenty percent (20%), or an additional $41,636.53, as explained below.

### Attorneys' Fees and Costs

After reviewing the memoranda submitted by the parties, the affidavits submitted to the court, and the relevant law, the court grants Ms. Parker $214,417.17 in attorneys' fees and costs. In calculating

---

**22.** 277 F.3d 128 (2nd Cir.2001), *cert. denied*, —— U.S. ——, 123 S.Ct. 110, 154 L.Ed.2d 34 (2002).

**23.** *See id.* at 136.

**24.** *See id.* at 137.

**25.** *See id.* at 136.

**26.** *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2nd Cir.1995).

**27.** *See* Plaintiff's Memorandum in Support of Application for Attorneys' Fees and Costs ("Memo in Support") at 1.

**28.** *See* Defendants' Memorandum in Opposition to Plaintiff's Application for Attorneys' Fees and Costs ("Opposition Memo") at 5–14 and Defendants' Reply to Plaintiff's Supplemental Application for Attorneys Fees and Costs at 2.

this award, the court has made three categorical deductions from Ms. Parker's original request. First, the court deducts $1,498.50, which is the amount that Ms. Parker's counsel later stipulated was not properly assessed against the defendants.[29] Second, the court reduces Ms. Parker's attorneys' fees by $4,486.00, which are charges for time spent on issues and pleadings dealing mostly, if not exclusively, with Maxim Healthcare Services, Inc. and Maxim Health Systems LLC (collectively "Maxim"), whom Ms. Parker settled with before trial. Having reviewed the pleadings closely and heard oral argument on the subject, the court finds that the entries set forth in the footnote below involved litigation connected with Maxim, not with the defendants.[30] Finally, the court deducts $250.00, which is the amount that Magistrate Judge Boyce already awarded to Ms. Parker for bringing a motion to compel discovery regarding contact information for Erwin Alex Sierra, a topic that is also covered in Ms. Parker's fee request.[31] The court has reviewed the remaining entries and the affidavits of Erik Strindberg, Frederick R. Thaler, and W. Mark Gavre, and finds them reasonable and properly attributable to responding to the defendants.

### Augmentation

■ Ms. Parker's counsel seeks an augmentation of the fee award by a factor of 25%. They argue that they have achieved "an outstanding result," a result that (in their view) represents "the largest verdict ever awarded in a sexual harassment case in Utah."[32] They contend that they took a substantial risk in pursuing this complex case pursuant to a contingent fee arrangement, a risk that should be reflected in the fee award.

■ The governing law on augmentation is somewhat difficult to fathom. The controlling Tenth Circuit decision is *Homeward Bound, Inc. v. Hissom Memorial Center.*[33] There, the Circuit considered the continuing viability of augmentation in the wake of expressions of disapproval from several Supreme Court justices. The Circuit concluded that "a contingency enhancement may be given...."[34] Such enhancements, the Circuit warned, "must be viewed with caution" and are "appropriate only in exceptional cases."[35] The Circuit clarified that an "exceptional case" is one "in which prior to the litigation, the attorney for the prevailing party was confronted with a real risk of not prevailing."[36] In making this determination, district courts are to consider whether "the law in effect at the time the suit was filed" was "unsettled" and whether "the outcome of the suit was dependant on the resolution of a disputed material fact." Augmentation is appropriate only where a "real risk of not prevailing" exists.

■ Once a real risk of not prevailing has been demonstrated, the party seeking

**29.** *See* Plaintiff's Reply Memorandum in Further Support of Application for Attorneys' Fees and Costs ("Reply Memo") at 6; Transcript of April 25, 2003 hearing on all pending motions.

**30.** *See* Opposition Memo at 5–14, disputed entry # 4 ($31.50); # 10 ($7.00); # 17 ($50.00); # 29 ($75.00); # 53 ($300.00); # 54 ($150.00); # 55 ($30.00); # 58 ($300.00); # 59 ($150.00); # 60 ($30.00); and # 66–72 (totaling $3,362.50).

**31.** *See* May 16, 2002, Docket Entry for Motion to Compel.

**32.** Plaintiff's Memo. in Support of Application for Attorney's Fees at 2.

**33.** 963 F.2d 1352 (10th Cir.1992).

**34.** *Id.* at 1359.

**35.** *Id.* (internal quotations omitted).

**36.** *Id.* (internal quotations omitted).

to enhance the lodestar must also come forward with evidence that, absent an enhancement, "the plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." [37] This difficulty "may be shown by evidence that the plaintiff encountered actual difficulty in securing counsel" or "by showing that lawyers in the relevant market, generally will not take cases on contingency absent some guarantee of an enhancement." [38]

In this case, plaintiff's counsel faced a real risk of not prevailing. In terms of the legal risk, this case raised significant questions such as whether an employer could be liable for a rape that occurred off—premises during a lunch break, and whether the Heritage Management entities could be considered a single employer for liability purposes. In addition, in terms of the factual risk, Ms. Parker's counsel faced considerable uncertainty when this case was filed. For example, neither Ms. Parker nor her attorneys knew about three of the four women that later testified that Mr. White assaulted them.[39] Needless to say, this later—discovered evidence corroborated Ms. Parker's allegations and bolstered Ms. Parker's likelihood of prevailing. But before these discoveries, Ms. Parker's allegations about the sexual encounter at issue had substantial inherent factual risk since, without any eyewitnesses, the trial essentially might have come down to Ms. Parker's word against Mr. White's word.

Given these facts, the court finds that, at the outset, this case presented a considerable risk to Ms. Parker's attorneys of not prevailing. Despite this risk, the jury returned a exceptional verdict in favor of Ms. Parker: $2,500,000 in compensatory and punitive damages.[40]

Before the court can augment a fee award for risk, however, the court must also find that the plaintiff would have faced substantial difficulties in obtaining counsel absent an augmentation. As noted above, the Tenth Circuit has offered two examples of how this showing can be made: proving actual difficulty by the plaintiff in obtaining counsel or proving that lawyers in the relevant market generally will not take cases on contingency absent some guarantee of an enhancement. In this case, Ms. Parker fortuitously was put in touch with Mr. Strindberg, so she had no actual difficulty in obtaining counsel. Plaintiff's counsel contend, however, that in the Utah market an enhancement of the contingency is necessary to attract lawyers to take Title VII cases of this complexity and magnitude. There is no dispute that Ms. Parker's counsel represented her on a contingency basis. Therefore, they bore the entire burden of not prevailing in this suit, and had no guarantee of payment from any source. To attract lawyers to take on a Title VII case of this complexity, they must be willing to accept a higher degree of risk than in simpler and less protracted litigation. In this case, Ms. Parker was forced to seek counsel that would be willing to bear the risk of non-payment of approximately $200,000 in attorneys' fees and costs over more than two years.[41] The court takes judicial notice of its own docket to conclude that most plaintiffs in employment cases are represented by lawyers at small law firms or solo prac-

---

37. *Id.* (internal quotations omitted).

38. *Id.* (internal quotations omitted).

39. *See* Reply Memo at 4.

40. *See* Judgment dated December 12, 2002.

41. *See* Affidavit of Erik Strindberg at 1–2; Affidavit of Frederick R. Thaler; and Affidavit of W. Mark Gavre.

titioners. Such lawyers are less likely to be able to absorb the costs of protracted litigation without an enhancement in contingency cases.

The court has also considered whether plaintiffs with employment disputes generally have difficulty in obtaining counsel. Ms. Parker's counsel represented that the number of practitioners in the employment law section of the Utah bar who represent plaintiffs is quite small and that further incentives are needed to attract skilled practitioners into this area. This representation was not disputed. Further, Ms. Parker's counsel submitted uncontroverted evidence that the risk in this case is increased by the general "uncertainty of representing plaintiffs in employment matters." [42]

The court is aware that augmentation must be approached with caution. Nonetheless, augmentation is appropriate in at least some cases. If this case does not qualify for augmentation, its is hard to see when *any* case would qualify. For all these reasons, the court concludes that in the Utah market an enhancement is necessary to attract lawyers to take exceptionally protracted, risky, and complex Title VII cases, such as this one.

Therefore, the court concludes that Ms. Parker's counsel has made a sufficient showing that this is an exceptional case warranting augmentation. In light of these considerations, the court augments Ms. Parker's fees by twenty percent (20%), which is $41,636.53.

### Conclusion

The court DENIES defendants' motion for new trial [Doc. # 153–1] and GRANTS in part plaintiff's motions for fees and

---

**42.** *See* Affidavit of W. Mark Gavre at 2.

costs [Doc. # 158–1 and Doc. # 172–1], for a total amount of $249,819.20.

SO ORDERED.