Filed 9/8/25

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STEVEN KRUITBOSCH,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BAKERSFIELD RECOVERY SERVICES, INC.,<br><br>Defendant and Respondent. | F087809<br><br>(Super. Ct. No. BCV-23-101448)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. David R. Zulfa, Judge.

Miracle Mile Law Group, Justin Hanassab, Steven I. Azizi and Caitlyn Handy for Plaintiff and Appellant.

Belden Blaine Raytis, T. Scott Belden, Felicia L. Mears and Tyler D. Anthony for Defendant and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, Factual Background, parts I. and V. of the Discussion, and the Disposition are certified for publication.

## INTRODUCTION

A coworker (Lisa Sanders) at plaintiff Steven Kruitbosch's job allegedly subjected him to crude sexual advances at his home and via his personal cell phone away from the premises of his employer, respondent Bakersfield Recovery Service, Inc. (BRS). When plaintiff reported the conduct to BRS's acting program director and a human resources (HR) representative, he was told there was nothing that could be done, ostensibly because it occurred off property. The HR representative made a social media post plaintiff understood to be mocking him, and she made a sarcastic comment to him about the harassment. Although plaintiff made efforts to avoid Sanders in the office, his distress at the prospect of interacting with her coupled with BRS's failure to protect him in the workplace and mocking him for his complaint detracted from his work duties and made continuing his employment feel impossible. Plaintiff resigned a week later. Plaintiff filed suit alleging several claims, including for harassment, discrimination and retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1] The trial court dismissed plaintiff's second amended complaint with prejudice and without leave to amend. We reverse in part and affirm in part.

For reasons we will explain, although Sanders's alleged conduct was reprehensible, it was not sufficiently work related within the ambit of FEHA, and it did not recur inside the workplace. Her underlying conduct is not imputable to BRS, and the claim is not cognizable on that basis. Nevertheless, the sexual harassment hostile work environment claim is viable based on a theory that BRS's response to plaintiff's complaint about Sanders's conduct altered plaintiff's work environment in an objectively severe manner. Plaintiff's claim for failure to prevent harassment, discrimination or retaliation under section 12940, subdivision (k) (§ 12940(k)) is dependent upon a viable

---

[1] All further undesignated statutory references are to the Government Code unless otherwise indicated.

claim for harassment, discrimination or retaliation; because plaintiff's underlying claim for sexual harassment is viable, plaintiff's section 12940(k) claim is also cognizable. With respect to these claims, we reverse the trial court's ruling sustaining BRS's demurrer.

As for the remaining claims, plaintiff did not sufficiently allege constructive termination or any other adverse employment actions necessary to support his claims for discrimination, retaliation, and constructive discharge in violation of public policy. Finally, plaintiff's claim for negligent hiring, supervision or retention does not sufficiently allege BRS's knowledge of the unfitness of its employees. With respect to these claims, we affirm the trial court's ruling.

## FACTUAL BACKGROUND

BRS provides substance abuse treatment to recovering alcoholics and drug addicts. In 2019, Plaintiff began working as an assistant corporate compliance officer at BRS. Plaintiff's job responsibilities required him to oversee client services, ensure all staff properly documented services, that staff were providing clients with evidence-based services, ensure facilities were operational and properly maintained, and ensure BRS adhered to contractual obligations. Plaintiff also trained all staff on various aspects of their jobs. Near the end of his employment, plaintiff was tasked with overseeing construction of a new facility that BRS was designing for clients. At various times during his employment, plaintiff attended sexual harassment trainings that made clear even sexual harassment off the clock was a violation of BRS policy.

Sanders was a case manager and one of plaintiff's coworkers. Plaintiff was "technically above her in [BRS's] chain of command." He was responsible for training her, ensuring her file was up to date with current trainings, answering questions she had about client care, and overseeing the new BRS site where she worked. Plaintiff and Sanders did not have any type of relationship outside of work—they had contact through text messages only for work-related purposes, and Sanders knew where plaintiff lived

only through work. During an average week, the two would interact about two to three times, but, depending on the circumstances, sometimes on a daily basis. Plaintiff's duties required him to visit Sanders's worksite, while Sanders had to visit plaintiff's worksite about once per week as part of her duties. When plaintiff began overseeing the new construction, which was at the BRS location where Sanders performed her job, plaintiff had to interact with Sanders more frequently.

Many of BRS's employees, including plaintiff, are recovering addicts, and most employees, including Sanders, knew plaintiff was sober after having struggled with drug addiction. Plaintiff and other employees were open about their addiction recovery as part of their work with BRS. In October 2022, plaintiff's long-time partner passed away. In dealing with the grief of that loss, plaintiff took leave under the California Family Rights Act beginning February 1, 2023, and was scheduled to return to work on March 7, 2023.[2] In the week leading up to plaintiff's return to work, Sanders began sending plaintiff multiple unsolicited nude pictures and stating she wanted to have sex with him; plaintiff firmly rejected these advances. On March 3, 2023, Sanders went to plaintiff's home uninvited and brought a friend. Sanders indicated to plaintiff she was there to have sex with him; plaintiff instructed the women to leave him alone and to stop harassing him. Sanders again indicated she wanted to have sex with plaintiff. Sanders eventually departed plaintiff's property, but in his driveway she left behind a cucumber with a condom attached. Later that same day, Sanders texted plaintiff and invited him to a hotel room to have sex and stated, "'I'm at the sleep inn & suites and I have dope … let me know if you want to fuck.'" (Italics and boldface omitted.) She also sent plaintiff multiple sexual images, including of her genitals, breasts and buttocks. Plaintiff rejected these advances.

---

2 The Moore-Brown-Roberti California Family Rights Act of 1993 (§§ 12945.1–12945.2) is commonly referred to as the California Family Rights Act. (See Cal. Code Regs., tit. 2, § 11087, subd. (b).)

On March 7, 2023, plaintiff returned to work and immediately complained to the acting program director Stephanie Carroll about Sanders's conduct. HR representative Kimberly Giles was also made aware that Sanders had sent plaintiff nude photos, propositioned him for sex, offered him drugs, and presented herself at his house. Carroll informed plaintiff that there was not much she could do about Sanders's behavior. Meanwhile, later that day, Giles posted a video on social media depicting whining dogs and stated, "'This is a work day at thr [*sic*] office … lmbo.'" (Italics omitted.) Later in the week, Giles sarcastically commented to plaintiff, "'I hope you don't get no more pictures.'" At no point did either Carroll or Giles take any steps to separate plaintiff from Sanders or prevent future harassment; nor did BRS take any disciplinary action as to Sanders.

The remainder of plaintiff's employment became unbearable, and he went to great lengths to avoid contact with Sanders, including asking a maintenance worker if she was working on a given day before traveling to her worksite. On another occasion, he called Sanders's worksite to determine whether her car was in the parking lot before he visited. Each day that week, plaintiff experienced extreme distress, fearful that he would be forced to see Sanders. Plaintiff was overcome with feelings of anger and humiliation knowing Sanders was free to continue harassing him after BRS did not condemn her actions. BRS's inaction intensified plaintiff's feelings of anger and helplessness. Plaintiff resigned on March 13, 2023, as he felt continuing to work at BRS would be detrimental to his mental health, his grief recovery process and his sobriety.

In May 2023, plaintiff filed suit against BRS and Sanders; plaintiff filed a first amended complaint a few weeks later. BRS filed a demurrer, which the trial court sustained with leave to amend. Plaintiff filed the operative second amended complaint (SAC) in October 2023 alleging nine claims against BRS, and a claim of intentional infliction of emotional distress against Sanders only: (1) hostile work environment sexual harassment in Violation of FEHA (§ 12940, subd. (j)); (2) sex/gender

discrimination in violation of FEHA (§ 12940, subd. (a)); (3) retaliation in violation of FEHA (§ 12940, subd. (h)); (4) failure to prevent harassment, discrimination, or retaliation in violation of FEHA (§ 12940(k)); (5) whistleblower retaliation in violation of Labor Code section 1102.5; (6) constructive termination in violation of public policy; (7) intentional infliction of emotional distress (against Sanders only); (8) negligent hiring, supervising, or retention; (9) failure to timely produce personnel records; and (10) failure to timely produce payroll records. BRS demurred as to all claims, except as to claims 9 and 10.[3]

After a hearing where the parties presented oral argument, the trial court sustained BRS's demurrer without leave to amend. The court reasoned as follows:

> "The court is not persuaded that the fact that the individuals involved met through their work relationship automatically means that any communications or any interaction that extends beyond that as a result of their introduction through the workplace is in fact something that is attributable to [BRS]. I do not believe that simply being coworkers is sufficient.
>
> "Additionally, to the extent that there are claims made pursuant to the 6th cause of action in particular, it does not appear as though there was an adverse action taken by [BRS] as it relates to the employment of our plaintiff in this situation. It is a situation where[,] as I believe Mr. Anthony, [BRS's counsel,] noted[,] that after making the employer aware, plaintiff was unhappy with the response of [BRS].
>
> "But that does not[,] I believe[,] establish a claim as set forth in the 2nd, 3rd, 5th and 6th causes of action. I also have concern that this does not appear to be a pervasive situation in that there was one instance that was or one time that there was a complaint to BRS.
>
> "And within a week of that complaint or approximately a week after that complaint is when the plaintiff chose to leave or felt compelled to leave

---

3 The intentional infliction of emotional distress claim against Sanders was dismissed after demurrer to the first amendment complaint; the claim was re-pled against Sanders in the SAC as the seventh cause of action, but it was not mentioned at the hearing or in the trial court's subsequent order on the demurrers as to the SAC. In any event, plaintiff has appealed only with respect to claims against BRS.

> BRS. And so with all of that in mind[,] I will sustain [BRS]'s demurrer to plaintiff's second amended complaint.
>
> "The amended allegations do fail to overcome the inadequacies addressed in the demurrer to the, to the first amendment complaint. Accordingly, I will sustain the demurrer to the 1st through 6th and the 8th causes of action without leave to amend." (Full capitalization omitted.)

Following the trial court's ruling, plaintiff dismissed his two remaining claims for failure to timely produce records and appealed with respect to BRS.

**DISCUSSION**

The standards under which the sufficiency of a complaint is tested against a general demurrer are well settled. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) "We not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.'" (*Ibid.*; see *Yalung v. State of California* (2023) 98 Cal.App.5th 71, 80 (*Yalung*).) We construe the complaint's allegations liberally with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Appellate courts "'treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.'" (*Blank v. Kirwan, supra*, at p. 318.) "'[W]e are not concerned with [the] plaintiff's ability to prove the allegations of the complaint, or the possible difficulties in making such proof.'" (*Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1268, quoting *Schmidt v. Foundation Health* (1995) 35 Cal.App.4th 1702, 1706.)

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "[T]he 'any possible legal theory' standard encompasses a legal theory presented for the first time [on appeal]." (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1244 (*Gutierrez*).) "A complaint must contain '[a] statement of the

facts constituting the cause of action, in ordinary and concise language.' (Code Civ. Proc., § 425.10, subd. (a)(1).) This fact-pleading requirement requires the plaintiff to allege *ultimate* facts that apprise the defendant of the claim's factual basis. [Citation.] Stated another way, the 'complaint must allege the ultimate facts necessary to the statement of an actionable claim.'" (*Yalung, supra*, 98 Cal.App.5th at p. 80.) "Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis, supra*, at p. 162.)

## I. Sexual Harassment: Hostile Work Environment

### A. FEHA Principles

The FEHA prohibits sexual harassment in the workplace. (See § 12940, subd. (j)(1); *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034 (*Health Services*).) Specifically, FEHA makes it an unlawful employment practice for an employer to harass an employee because of the employee's "sex, gender, gender identity, gender expression, … [or] sexual orientation …." (§ 12940, subd. (j)(1).)

"'[T]he prohibition against sexual harassment includes protection from a broad range of conduct, [including] the creation of a work environment that is hostile or abusive on the basis of sex.'" (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).) "[A] plaintiff in a sexual harassment suit must show 'the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] … because of … sex."'" (*Id.* at p. 280, italics omitted.) "'To plead a cause of action for … sexual harassment, it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man [or a woman, he or] she would not have been treated in the same manner.'" [Citation.]' [Citations.] Accordingly, it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim." (*Ibid*.)

"[P]rohibited harassment includes 'verbal, physical, and visual harassment, as well as unwanted sexual advances.' [Citation.] In this regard, *verbal* harassment may include epithets, derogatory comments, or slurs on the basis of sex; … *visual* harassment may include derogatory posters, cartoons, or drawings on the basis of sex." (*Lyle, supra*, 38 Cal.4th at pp. 280–281.) "'The working environment must be evaluated in light of the totality of the circumstances.' [Citations.] '"These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' [Citations.] '"The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct."' [Citation.] '"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)"' are not sufficient to create an actionable claim of harassment." (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 628 (*Bailey*); accord, *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." (*Bailey, supra*, at p. 629; accord, *Miller, supra*, at p. 462.)

In addition, the plaintiff "must establish the offending conduct was imputable to [his or] her employer." (*Lyle, supra*, 38 Cal.4th at p. 279 [indicating the imputation of liability applies to both FEHA and federal Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.) (Title VII) hostile work environment claims].) "Sexual harassment in a workplace is imputable to an employer in two situations." (*Carranza v. City of Los Angeles* (2025) 111 Cal.App.5th 388, 401.) In the first situation, "'[w]hen the harasser is a supervisor, the employer is strictly liable for the supervisor's actions.'" (*Bailey, supra*, 16 Cal.5th at p. 635.) "[H]owever, … an employer is only strictly liable under FEHA for harassment by a supervisor if the supervisor is acting in the capacity of supervisor when the harassment occurs." (*Atalla v. Rite Aid Corp.* (2023) 89 Cal.App.5th 294, 309–310 (*Atalla*), citing *Health Services, supra*, 31 Cal.4th at p. 1041, fn. 3.) "The employer is not

strictly liable for a supervisor's acts of harassment resulting from a completely private relationship unconnected with the employment and not occurring at the workplace or during normal working hours." (*Health Services, supra*, at p. 1041, fn. 3.)

In the second situation, "'[w]hen the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence ….' [Citation.] Specifically, '[h]arassment of an employee … by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action.'" (*Bailey, supra*, 16 Cal.5th at p. 635, quoting § 12940, subd. (j)(1).)

"The underlying goal of FEHA … is to provide effective measures to prevent *workplace* harassment." (*Atalla, supra*, 89 Cal.App.5th at p. 309, citing *Health Services, supra*, 31 Cal.4th at pp. 1046–1047.) Therefore, "there is a need to determine whether sexual conduct that occurs off the worksite or after working hours constitutes an 'unlawful employment practice' within the ambit of [FEHA]." (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1016, fn. 14 (*Farmers*), quoting § 12940.) Citing precedential decisions of the Fair Employment and Housing Commission, courts have explained that "while the harassing conduct need not occur in the workplace, it must occur in a work-related context.… 'Unwelcome sexual conduct perpetrated by an agent, supervisor, or coworker, which occurs elsewhere but is in some fashion work-related also constitutes sexual harassment within the meaning of [FEHA].'" (*Capitol City Foods, Inc. v. Superior Court* (1992) 5 Cal.App.4th 1042, 1048 (*Capitol City Foods*), quoting *DFEH v. Huncot Properties* (Dec. 15, 1988) FEHC No. 88–21, at p. 8.)[4]

---

[4] The Fair Employment and Housing Commission (FEHC) was eliminated effective January 1, 2013. (Stats. 2012, ch. 46, § 35.) Traditionally, decisions of the former FEHC interpreting who may be liable under FEHA are entitled to "'great respect'" by the courts. (*Auburn Woods I Homeowners Assn.. v. Fair Employment & Housing Com.* (2004) 121 Cal.App.4th 1578, 1591 [judicial review of FEHC decision].)

In sum, to prevail on a claim of hostile work environment under FEHA, an employee must establish he or she was subjected to harassing conduct that was (1) unwelcome, (2) because of sex or gender, and (3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. (*Bailey, supra*, 16 Cal.5th at p. 627; *Lyle, supra*, 38 Cal.4th at p. 279; § 12940, subd. (j)(4)(C).) The plaintiff also must show the harassing conduct is, in some fashion, work related (*Farmers, supra*, 11 Cal.4th at p. 1016, fn. 14) and imputable to the employer under the applicable standard (*Bailey, supra*, at p. 635).

### B. Sanders's Unwanted Sexual Advances Were Not Work Related

The trial court concluded Sanders's harassing conduct was not sufficiently work related to come within the scope of FEHA and, in any event, the conduct was not sufficiently pervasive or severe. Plaintiff maintains the trial court erred with respect to the work-related nature of Sanders's conduct because Sanders was plaintiff's coworker; they did not have a personal relationship outside of work; they communicated primarily about work-related matters; Sanders obtained plaintiff's cell phone number and home address only through work; and plaintiff reported the conduct at work.

BRS argues the relevant allegations were limited to Sanders's afterhours conduct and away from BRS's premises, beyond the scope of FEHA. BRS maintains Sanders's conduct was entirely unrelated to either employee's work for BRS and is not actionable simply because plaintiff and Sanders are employees of BRS or because plaintiff reported Sanders's nonwork-related conduct to BRS.[5]

In making their arguments, the parties dispute the relevance of several cases involving *supervisor harassment* that occurred away from the office and/or during nonworking hours. (*Capitol City Foods, supra*, 5 Cal.App.4th 1042; *Doe v. Capitol*

---

**5** For purposes of appeal, the parties appear to agree that whether Sanders's conduct was work related does not hinge on plaintiff's leave status at the time.

*Cities* (1996) 50 Cal.App.4th 1038 (*Capitol Cities*); *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403 (*Myers*); *Atalla, supra*, 89 Cal.App.5th 294.) For ease of discussion, we begin with a brief description of those cases, keeping in mind that the context of each case involved the strict liability standard for imputing a *supervisor's* conduct to the employer, and *not* the negligence standard for imputing a nonsupervisory *coworker's* conduct to the employer.

In *Capitol City Foods*, the court considered whether a supervisor's off-site rape of an employee was sufficiently within the scope of the supervisor's employment to hold the employer strictly liable. There, the employee (Mary) asked her supervisor (Johnson) to go for a drink with another coworker. The other coworker was ultimately unable to meet them, and Johnson picked up Mary, who was still in her work uniform, at a grocery store. (*Capitol City Foods, supra*, 5 Cal.App.4th at p. 1044.) While they drove around, Johnson called the employer's facility and told a manager that Mary should not have been scheduled to work that night, and if she wanted to work that day, she would come in late. Johnson took Mary to his parents' house, where they had sexual intercourse. Johnson dropped Mary off afterwards at an auto repairs store, and he went to the employer's facility. The next day Mary told the manager Johnson had raped her, and she quit shortly after.

In considering whether Johnson's behavior away from the employment premises was imputable to the employer under a strict liability theory, the court drew from the rationale of several FEHC decisions:

> "Precedential decisions of the Fair Employment and Housing Commission have recognized that while the harassing conduct need not occur in the workplace, it must occur in a work-related context. '[W]hile the offending conduct may and often does occur at the place of work, it need not. Unwelcome sexual conduct perpetrated by an agent, supervisor, or coworker, which occurs elsewhere but is in some fashion work-related also constitutes sexual harassment within the meaning of [FEHA].' (*DFEH v. Huncot Properties* (December 15, 1988) FEHC Dec. No. 88–21, at p. 8.) Where a supervisor exerted and exploited his authority to compel an

> employee's attendance at several [miles] away from the office, the use and abuse of his supervisory status was sufficient to bring his sexually harassing conduct outside of the workplace within the ambit of [FEHA]. (*DFEH v. Bee Hive Answering Service* (June 7, 1984) FEHC Dec. No. 84–16, at p. 19.)
>
> "Further, the commission has applied common law agency principles to determine whether sexually harassing conduct was work-related. In *DFEH v. Hart and Starkey, Inc.* (Sept. 14, 1984) FEHC Dec. No. 84–23, the employer disavowed liability for acts of an employee while off duty but on the premises. In finding the employer liable, the commission relied on the agency analysis in *Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608. (*DFEH v. Hart and Starkey, Inc., supra*, at p. 28.) In *Rodgers* the court stated an employer was liable for risks inherent in or created by the enterprise. (50 Cal.App.3d at p. 618.) For social pursuits on the premises after work, an employer was liable if (1) it endorsed the activity by express or implied permission and (2) the activity was conceivably of some benefit to the employer or was a customary incident of the employment relationship. (*Id*. at p. 620.)" (*Capitol City Foods, supra*, 5 Cal.App.4th at pp. 1048–1049.)

In concluding Johnson's conduct was not imputable to the employer, the court emphasized Johnson had not abused his supervisory position to coerce his contact with Mary. (*Capitol City Foods, supra*, 5 Cal.App.4th at p. 1049.) The court reasoned that Mary agreed to meet and accompany Johnson; she did not object to being with him, nor did he say or do anything to indicate coercion. (*Ibid.*) The court rejected Mary's argument that "'but for'" Johnson's position as supervisor, the rape would not have occurred, reasoning the evidence was conclusive that Johnson had not forced Mary to accompany him. (*Id.* at pp. 1049–1050.) Further, because there was no evidence of coercion, the phone call Johnson made to the employer's facility was insufficient to support an inference Johnson was acting within the scope of his employment during the time he was with Mary. (*Id.* at p. 1050.)

These general principles were applied a few years later in *Capitol Cities*, another case involving sexual assault and employment. (*Capitol Cities, supra*, 50 Cal.App.4th 1038.) There, an associate director of casting at television network ABC (Marshall)

interviewed the plaintiff for an acting position. (*Id.* at p. 1042.) Marshall spent several hours a day for several weeks working with the plaintiff on auditions, tapings, and meetings with other entertainment industry executives to find an agent and a publicist for the plaintiff, all in hopes it would lead to an employment contract between the plaintiff and ABC. (*Id.* at p. 1043.) Marshall advised the plaintiff he had a brunch to go to in the morning, and to come to Marshall's house early the next morning. (*Ibid.*) The plaintiff did so, expecting to attend a meeting where he would meet industry executives for ABC; Marshall drugged the plaintiff; when the plaintiff awoke, he was bound and tied, given multiple injections of an unknown drug and was beaten and gang-raped by Marshall and four confederates, none who had any affiliation with ABC. (*Ibid.*)

The appellate court explained that while the plaintiff's complaint adequately alleged Marshall's status as an agent, triggering ABC's strict liability for Marshall's actions, the fact the assault occurred at Marshall's home on a Sunday presented a separate issue of whether Marshall's conduct could be imputed to ABC. (*Capitol Cities, supra*, 50 Cal.App.4th at p. 1047.) Relying on *Capitol City Foods*, the court applied principles of respondeat superior to conclude the plaintiff's allegations were adequate as a matter of law to hold ABC strictly liable. (*Capitol Cities, supra*, at pp. 1048–1049.) The court reasoned it was insignificant that the plaintiff never alleged Marshall told him the Sunday brunch was an ABC-sponsored event or even work related; the plaintiff had alleged Marshall regularly spent several hours a day with him, arranged auditions and meetings, and invited him to dine with him to meet with entertainment executives. (*Id.* at p. 1050.) "Because the relationship was driven by Marshall's demonstrable positive interest in furthering [the] plaintiff's career, it is not farfetched that [the] plaintiff believed his attendance [at Marshall's home] had something to do with advancing his ambition to obtain employment as an actor." (*Ibid.*) Finding it insignificant that the plaintiff was not an ABC employee, the court explained "[a]ll that is required is a showing of a legally sufficient nexus between the employment relationship and the act of harassment. That is,

as long as the harassment occurs in a work-related context, the employer is liable." (*Id.* at p. 1051.)

More recently, in *Myers*, the appellate court concluded the plaintiff's FEHA claim against her employer survived summary judgment, even though the supervisor's harassment occurred off-site. (*Myers, supra*, 148 Cal.App.4th at pp. 1424–1425.) There, the employer sold vacation timeshares, and its employees sometimes offered to follow customers home who had failed to bring their checkbook or credit card, which the sales force called "'driving for dollars.'" (*Id.* at p. 1412.) During two "'driving for dollars'" excursions, the plaintiff was groped by her supervisor. (*Ibid.*) On the first occasion, the supervisor acted as though he was lost on the drive, and he then parked on an isolated dirt road; on the second, he drove the employee to his home, ostensibly to get work-related documents. (*Id.* at p. 1412.) In finding the employer could be held strictly liable, *Myers* explained that in the case before it, the harassment did not arise from a completely private relationship untethered to employment, reasoning there was no personal dating relationship, and the "'driving for dollars'" trips benefitted the employer's enterprise, even if it did not endorse that activity. (*Id.* at p. 1421.)

Similarly, in *Atalla*, a panel of our court recently considered whether an employer could be held strictly liable under FEHA for a supervisor's harassment outside of work during nonworking hours. (*Atalla, supra*, 89 Cal.App.5th 294.) In that case, a pharmacy employee (Atalla) had a long-standing personal friendship with a supervisor for a series of Rite Aid stores that predated Atalla's subsequent employment at a Rite Aid pharmacy. (*Id.* at pp. 300–306.) During a text exchange, among the hundreds between the two during the course of their friendship, the supervisor (Lund) sent explicit photographs of himself to Atalla while she was at home. (*Id.* at pp. 304–305.) Atalla reported the incident to Rite Aid, and Lund's employment was terminated. (*Id.* at pp. 305–306.) Framing the issue as whether Lund was acting in the capacity of a supervisor in the text exchange in which he sent the inappropriate text, the court concluded Rite Aid was not

liable for Lund's conduct because his texts were not sufficiently work related—i.e., he was not acting in his capacity as a supervisor. (*Id.* at p. 313.) The court explained the undisputed evidence showed the personal relationship between the two had predated Atalla's employment at Rite Aid (*id.* at p. 314); she was a willing participant in their communications outside of work and after work hours (*ibid.*); and, although Lund had asked Atalla about her work week when he sent the harassing texts, this inquiry "was insufficient to render the text exchange work-related" (*id.* at p. 315). The court reasoned "[t]here was no evidence that the nature of Lund's work and Atalla's work itself created a risk of the type of intentional tort Lund committed." (*Id.* at p. 316.) Nor was the personal texting relationship between the two undertaken for Rite Aid's benefit.

As these cases demonstrate, where the conduct at issue occurred off-site and/or during nonworking hours, the question of whether the employer is strictly liable for a supervisor's conduct tends to overlap with whether the conduct is sufficiently work related. Specifically, if the supervisor is, in some fashion, acting in his or her capacity as supervisor (or misusing his or her supervisory powers) when the conduct occurs—necessary for imputability to the employer (*Health Services, supra*, 31 Cal.4th at p. 1041 & fn. 3)—then the harassing conduct is inevitably going to be work related.

Differently in coworker-nonsupervisory harassment cases involving off-site and/or nonworking-hours conduct, the assessment of an employer's liability under a negligence standard considers whether the employer knew or should have known of the conduct and failed to act; this analysis does not necessarily overlap with the work-related nature of the conduct. As a result, although potentially relevant, the various factors considered to determine work relatedness in the supervisor-harassment context, like the existence of a personal relationship, do not all neatly translate to the assessment of whether coworker harassment is sufficiently work related. (See *Ferris v. Delta Air Lines, Inc.* (2d Cir. 2001) 277 F.3d 128, 135, fn. 2 (*Ferris*) [commenting that, in analyzing whether coworker's harassing conduct is work related, cases finding or implying that sexually abusive

conduct *committed by supervisors* away from the place of employment can sustain an employer's liability "depend at least in part on a significantly different theory"].)[6]

The parties have cited no FEHA cases that explore whether the harassing conduct of a nonsupervisory *coworker* occurring *away from the workplace* is imputable to the employer, and our research has revealed none in this context. As such, we turn to analogous federal authority in the Title VII context. Like FEHA, for conduct to be imputable to an employer under Title VII, the offending conduct must bear a sufficient nexus to the workplace. (*Lapka v. Chertoff* (7th Cir. 2008) 517 F.3d 974, 983 (*Lapka*); see *Ferris, supra*, 277 F.3d at p. 135.) *Ferris* involved a Delta flight attendant (Ferris) who flew with a crew from New York City to Rome, Italy. (*Ferris, supra*, at p. 131.) Once in Rome, the crew (including Ferris and another flight attendant, Young) took a Delta bus to a hotel where Delta had reserved and paid for a block of rooms for the crew until their return flight to New York the next day. (*Ibid.*) Ferris and Young shopped together in the afternoon, and afterwards Ferris went to Young's room for a glass of wine. (*Ibid.*) After half a glass, Ferris felt faint; she could not walk to return to her room, and she blacked out. (*Ibid.*) While she was unconscious, Young took off her clothes and raped her. (*Ibid.*)

In the ensuing lawsuit, the district court granted summary judgment to Delta on Ferris's harassment claim based on the rape in Rome because that conduct did not occur in a work environment. (*Ferris, supra*, 277 F.3d at pp. 134–135.) Although considering it a close question, the appellate court disagreed. The appellate court emphasized the rooms were booked and paid for by the employer; and the off-duty time on a brief layover in a foreign country added to the likelihood crew members would spend that time together—although the employer did not direct how the crew would spend its off-duty

---

**6** An employer is liable under Title VII for nonsupervisory harassment under the same negligence standard as FEHA. (*Bailey, supra*, 16 Cal.5th at p. 626 [California courts often look to Title VII authority in construing the FEHA because of the similarities between the two acts].)

hours, the circumstances tended to compel that result. (*Id.* at p. 135.) The court concluded a jury could find Young's hotel room was part of Ferris's work environment within the meaning of Title VII. (*Ferris, supra*, at p. 135.)

Similarly, in *Lapka*, the plaintiff was raped by a coworker while attending a training at an employer's training facility. (*Lapka, supra*, 517 F.3d at p. 979.) The training facility's campus was a restricted-access site that included dormitories, classrooms, a dining facility and a bar. (*Ibid.*) Lapka and a colleague drank at the bar; a coworker (Garcia) offered them a ride back to their hotel (apparently away from the training facility), where he proceeded to rape Lapka. (*Ibid.*) In finding the harassment sufficiently related to the workplace, the court emphasized the bar was part of the training facility, and so "the event could be said to have grown out of the workplace environment." (*Id.* at p. 983.) The court also reasoned that the training sessions at the facility were required, and that the employees were on official duty while they were there. Analogizing to *Ferris*, the court explained the training facility is different from a typical workplace, where employees go home at the end of their workday; employees in this situation can be expected to "'band together for society and socialize as a matter of course.'" (*Lapka, supra*, at p. 983, quoting *Ferris, supra*, 277 F.3d at p. 135.)

Together, these cases provide persuasive guidance that the work-related nature of conduct is examined under the totality of the circumstances. From the cited authority, a number of nondispositive factors relevant to the assessment can be gleaned: whether the harassing conduct occurred (1) in (or through) a venue or modality that was paid for or hosted by the employer (*Ferris, supra*, 277 F.3d at p. 135*; Lapka, supra*, 517 F.3d at p. 983); (2) from or in circumstances the employer had arranged, sanctioned or approved (*Ferris, supra*, at p. 135*; Lapka, supra*, at p. 983); (3) in a context where the employer was deriving, or could be expected to obtain, some benefit (*Myers, supra*, 148 Cal.App.4th at p. 1421 ["'driving for dollars'" excursions obviously connected with employment and of benefit to employer]); or (4) in the context of employment-related

social circumstances where it would be expected that employees would interact and socialize (*Ferris, supra*, at p. 135*; Lapka, supra*, at p. 983; see *Capitol Cities, supra*, 50 Cal.App.4th at p. 1050 [social setting was the usual context for harasser and target to conduct work activities]). In nonsupervisory coworker conduct cases, the personal relationship of the coworkers, although perhaps relevant, does not take on the same importance as in supervisor-harassment cases where a personal relationship is a necessary element for an exception to liability. (See, e.g., *Ferris, supra*, at p. 135.) The Ninth Circuit has emphasized in the Title VII context that the relevant question is not whether the harassing conduct occurred on or off the physical or digital worksite, but whether, under the totality of the circumstances, the "harassing conduct had an unreasonable *effect* on the working environment and, if so, to consider whether and how the employer responded to that effect." (*Okonowsky v. Garland* (9th Cir. 2024) 109 F.4th 1166, 1180.) Under that standard, "offsite and third-party conduct can have the effect of altering the working environment in an objectively severe or pervasive manner." (*Ibid*.)

Here, there are no allegations that Sanders approached plaintiff at his home or contacted him on his cell phone on March 3, 2023, for any work-related purpose, even pretextually. There are no allegations indicating the conduct occurred from a workplace modality the employer provided or sanctioned explicitly or implicitly—i.e., cell phone or email provided by the workplace; Sanders's unwanted sexual advances themselves had nothing to do with work—they did not occur in the context of a work-related event, arise from circumstances approved, sanctioned or paid for by BRS, or derive from work-related social circumstances where employees would foreseeably interact and socialize. Although the SAC alleges Sanders obtained plaintiff's contact information only through work, it does not allege BRS promoted or facilitated employees' exchange of personal contact information or benefited from it. The mere fact Sanders and plaintiff knew each other only through work does not make Sanders's conduct toward plaintiff work related any more than if she had surreptitiously followed him home from the workplace one day.

(See *Fuller v. Idaho Department of Corrections* (9th Cir. 2017) 865 F.3d 1154, 1162, fn. 7 (*Fuller*) [noting rapes of girlfriend-coworker away from the worksite were not actionable as workplace harassment].)

We are also unpersuaded by plaintiff's argument that his report of Sanders's conduct to his work supervisors on March 7, 2023, retroactively rendered her conduct work related. If that were the case, anything an employee did outside the office would be work related if a coworker subsequently reported it. Finally, there are no allegations Sanders continued this behavior in the workplace when plaintiff returned to work. While thoroughly repugnant, the allegations regarding Sanders's conduct do not involve work-related harassment. That is not the end of the inquiry, however, because plaintiff alleges his employer's *response* to his complaint about Sanders's conduct unreasonably affected his working environment.

### C. BRS's Failure to Act and Giles's Conduct

An employer's response to harassment occurring outside the physical or digital workplace can independently create a hostile work environment. (*Fuller, supra*, 865 F.3d at pp. 1162–1164 [whether supervisors' responses to an employee's off-site rape of another employee created hostile work environment precluded summary judgment]; see *Little v. Windermere Relocation, Inc.* (9th Cir. 2001) 301 F.3d 958, 967 [employer's response to client's rape of employee reinforced harassment and contributed to hostile work environment].)

Plaintiff argues Giles's comment and social media post mocking him, *in conjunction* with BRS's ratification of Sanders's conduct through inaction, materially altered his working conditions. Plaintiff contends that his working conditions were materially altered when his supervisor, Carroll, made clear that BRS would not be taking any action in response to his complaint. Because plaintiff had to regularly interact with Sanders, BRS's refusal to do anything caused him to fear coming to work in anticipation Sanders would continue to harass him, potentially endangering his sobriety. He worked

in a state of anxiety, and he feared that his coworkers and supervisors would continue to mock his complaints as Giles had done. Plaintiff notes he went to great lengths to avoid Sanders in the workplace. All of this together, plaintiff claims, dramatically interfered with his ability to do his job and constituted a hostile work environment.

Although plaintiff's initial arguments focus largely on Sanders's conduct and whether BRS failed to take immediate and appropriate corrective action exposing it to liability under a negligence standard, we directed the parties to file supplemental briefs regarding whether plaintiff has stated a cognizable hostile work environment sexual harassment claim analogous to *Fuller*, where the plaintiff's supervisor's *response* to her report of an off-site rape by her coworker-boyfriend independently created a hostile work environment. (*Fuller, supra*, 865 F.3d at pp. 1162–1164.)

In *Fuller*, after reporting she had been raped by her coworker-boyfriend (Cruz), the plaintiff's work supervisors publicly and internally supported Cruz and expressed concern for his well-being, even after seeing the documented photographs from the rape investigation; provided Cruz with paid administrative leave during the investigation, but denied it to the plaintiff during her recovery from the rapes; forced her to return to work against her therapists and doctor's recommendations, while Cruz continued on administrative leave; and they declined to tell other employees why Cruz was under investigation, leading to coworker resentment because of the plaintiff's unexplained time off. (*Fuller, supra*, 865 F.3d. at pp. 1162–1163.)

In reversing a grant of summary judgment for the employer, the appellate court reasoned a reasonable juror could find the employer's public and internal endorsement of Cruz made it more difficult for the plaintiff to do her job, take pride in her work, or desire to stay in her position; a reasonable juror could also perceive the supervisors' repeated statements of concern for Cruz's well-being as evincing their belief the plaintiff was lying or that they valued the Cruz's reputation and job over the plaintiff's safety. The court concluded a reasonable juror could find the plaintiff's employer's reaction "'allowed the

effects of the rape[s] to permeate [her] work environment and alter it irrevocably,'" and was sufficiently severe or pervasive to create a hostile work environment. (*Fuller, supra*, 865 F.3d at p. 1164.)

In his supplemental brief, plaintiff argues the SAC pleads ample facts to support a viable claim for hostile work environment based on Giles's and Carroll's collective actions and inactions that mirror *Fuller* and were, in fact, more troubling because, rather than beginning an investigation as in *Fuller*, Carroll refused to take *any* action and Giles mocked plaintiff's complaint on social media and made a sarcastic comment to him. According to plaintiff, Carroll and Giles's collective action "condoned and cemented" the effects of Sanders's harassing conduct, affecting his ability to effectively perform his job.

BRS maintains *Fuller* is distinguishable in material respects; *Fuller*'s analysis, BRS argues, was inextricably linked to off-site conduct of the most severe nature and magnitude that is not comparable to Sanders's conduct here—which was "an aberrational, isolated series of unwelcome sexual advances over the course of a *single day*"[7] with no other inappropriate behavior either before or after. BRS argues its response to plaintiff's complaint would not have had the objective effect of polluting plaintiff's workplace with sex-based animus; Carroll's communication there was little that could be done constituted only a personnel decision, and Giles—at worst—made two off-color jokes that were nothing more than off-hand comments or insensitive teasing.

"Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.] 'The working environment must be evaluated in light of the totality of the circumstances.' [Citations.]

---

7 The SAC does not make clear whether Sanders's conduct was limited to a single day, although plaintiff's supplemental reply brief seems to support this view. The SAC's paragraph 19 alleges that in the week "leading up to his return" to work, Sanders began openly harassing plaintiff and sending him multiple unsolicited nude photographs and repeatedly stating she wanted to have sex with him. This could be a summary of the conduct that occurred solely on March 3, 2023, but it could also be referencing additional conduct in the "week leading up to" plaintiff's return to work.

'"These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' [Citations.] '"The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct."' [Citation.] '"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)"' are not sufficient to create an actionable claim of harassment." (*Bailey, supra*, 16 Cal.5th at p. 628.) "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." (*Id.* at p. 629.)

Accepting the truth of the SAC's allegations at the demurrer stage, and considering the totality of the circumstances, we cannot conclude as a matter of law that Carroll's inaction and Giles's comments, collectively, could not alter plaintiff's working environment in an objectively severe manner. While Sanders's conduct did not amount to a sexual assault like in *Fuller*, the sexual advances she made were aggravated and extreme considering the circumstances. Sanders showed up uninvited at plaintiff's home while he was taking leave to grieve the death of his long-time partner and sexually propositioned him. After he rebuffed her advances, she left a cucumber in his driveway covered with a condom—something a reasonable person in plaintiff's circumstances would find to be an unsettling and humiliating lewd gesture, especially since it was done in public and viewable by others.

Undeterred, Sanders then began sending plaintiff nude pictures of herself, and drew on plaintiff's status as a recovering addict to again proposition him for sex, telling him she had "'dope.'" From the allegations, it can be reasonably inferred Sanders leveraged information plaintiff had revealed at work about his addiction status given the addiction-recovery services BRS provides to clients, and used it to advance her own sexual agenda, arguably compounding the pressure she was placing on plaintiff for sex. This was no mere unwelcome series of requests for a date.

Against this backdrop, when plaintiff told Carroll and Giles that Sanders had "sent him nude photos, propositioned him for sex, offered him drugs, and presented herself at his house," Carroll's statement there was not much that could be done could be viewed as having an unreasonable effect on plaintiff's working environment, altering it in a severe manner. (*Okonowsky v. Garland, supra*, 109 F.4th at p. 1180.) There was no investigation of plaintiff's complaint, no admonition to Sanders to cease her conduct, and BRS took no steps to shield plaintiff from having to interact with Sanders unsupervised. As alleged in the complaint, despite that BRS had investigated other off-the-clock harassment of a female employee, it refused to do anything regarding plaintiff's complaint.

A reasonable person in plaintiff's circumstances could understand from such a response that it was not that Sanders's conduct occurred off-site which prevented BRS from acting, but that BRS viewed what she had done as not serious; that plaintiff, as a man, should not be affected by sexual advances from a woman; and that plaintiff's well-being in the workplace was of no import to BRS. Plaintiff was left to navigate his working interactions with Sanders—which he alleges occurred two to three times a week—totally on his own. As a result, after Carroll refused to take any action, plaintiff was forced to go to great lengths to avoid Sanders, and he operated in a state of extreme distress and fear that he would be forced to see Sanders; this constant state of heightened anxiety interfered with plaintiff's ability to do his job as simple tasks became arduous, and his attention to detail began to wane.

Moreover, plaintiff alleges Giles's mocking and sarcastic comments compounded the effect of Carroll's refusal to take any action. Due to Giles's status as HR representative, her sarcastic response to plaintiff about the nude photographs and her social media post can be viewed as more than merely an isolated instance of simple teasing. Giles's and Carroll's reactions, together, could be reasonably viewed as sending a message that BRS was not concerned about Sanders's conduct toward plaintiff; that

unwanted sexual advances, including those that threatened plaintiff's sobriety, were acceptable; and that plaintiff was not warranted in asking BRS to address it to ensure his workplace was harassment free.

BRS argues Carroll's and Giles's responses, and their effect on plaintiff's workplace, cannot be compared to a case like *Fuller*, where the off-site conduct involved sexual assaults, and the employer's response left the plaintiff fearing for her physical safety at work, among other things. (*Fuller, supra*, 865 F.3d at p. 1162.) At oral argument, BRS reiterated Carroll's and Giles's conduct amounted to nothing more than a personnel decision plaintiff did not like and a couple of insensitive comments. We are unpersuaded. In the context of their aggravated nature and Sanders's use of plaintiff's recovery status to leverage her sexual advances toward him, BRS's refusal to take any action could be viewed as altering plaintiff's working environment in an objectively severe manner. The very nature of BRS's business involved addiction treatment and recovery services—an environment where employees, including plaintiff, were open about their addiction history. Sanders's use of this information arguably increased the severity of her unwelcome sexual advances, and BRS's failure to take any action could reasonably be viewed as condoning Sanders's harassing behavior and compromising the safety of plaintiff's workplace environment for purposes of his sobriety.

In sum, given the allegations, the severity inquiry is factual in nature and not appropriate for resolution at the pleading stage. While plaintiff's sense of physical safety at the workplace may not have been threatened to the degree in *Fuller*, when viewing the totality of the circumstances presented here, BRS's refusal to take *any* action while simultaneously mocking plaintiff's concerns, could indicate to a reasonable person in plaintiff's circumstances that BRS had no objection to Sanders's conduct; and that plaintiff's concerns about her conduct were a literal joke to BRS. Given the aggressive nature of Sanders's sexual advances, Carroll's complete inaction and Giles's conduct as BRS's HR representative could be viewed as having the effect of altering plaintiff's work

environment in an objectively severe manner, as plaintiff alleges. (See *Carranza v. City of Los Angeles, supra*, 111 Cal.App.5th at p. 404 [employer's refusal to direct employees to stop sharing harassing photograph, direct employees the photos did not depict the harassed employee, or discipline anyone involved in distribution of the photo spoke not only to the sufficiency of the employer's response to the harassment, but also to the "severity of the harassment itself and the impact on" the victim's work environment].)[8]

When reviewing a general demurer, appellate courts must make a de novo determination of whether the complaint alleges "facts sufficient to state a cause of action under *any possible legal theory*." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 870, italics added.) "[T]he 'any possible legal theory' standard encompasses a legal theory presented for the first time in an opening appellant's brief," and "includes legal theories first raised by the reviewing court." (*Gutierrez, supra*, 19 Cal.App.5th at pp. 1244–1245.) Although explored in supplemental briefing pursuant to Government Code section 68081, plaintiff's hostile work environment sexual harassment claim is viable based on the theory BRS's response to plaintiff's complaint about Sanders's off-site conduct altered plaintiff's working environment in an objectively severe manner. (*Blank v. Kirwan, supra*, 39 Cal.3d. at p. 318 [appellate court to "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context"]; accord, *Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; see *Limon v. Circle K Stores Inc.* (2022) 84 Cal.App.5th 671, 688.) For clarity, plaintiff's complaint should be amended to organize the allegations pursuant to this cognizable theory.

---

**8** In reaching this conclusion, we are not suggesting FEHA mandates a specific response an employer must make to an employee complaint of harassment.

## II. Adverse Employment Action[*]

The trial court concluded BRS took no adverse action with respect to plaintiff's complaint about Sanders, and this fatally undermined plaintiff's claims for discrimination on the basis of sex under FEHA (2d cause of action); retaliation in violation of FEHA (3d cause of action); and whistleblower retaliation under Labor Code section 1102.5 (5th cause of action). Further, the court found plaintiff was not constructively discharged such that it could constitute a materially adverse employment action.

Plaintiff contends he suffered an adverse employment action when BRS failed to prevent discrimination and harassment in refusing to do anything after he reported Sanders's conduct, and that this failure materially affected the terms, conditions and privileges of his employment; and BRS constructively terminated his employment. Plaintiff maintains BRS forced him to continue working alongside his sexual harasser in a work environment that was not free from harassment or the psychological effects—including Giles's mocking comments—which affected his ability to perform his job duties.

### A. Basic Legal Principles

Neither party disputes that suffering an adverse employment action that materially affects the terms, conditions, or privileges of employment is a necessary element for each of plaintiff's claims for discrimination and retaliation under FEHA and Labor Code section 1102.5. (*Bailey, supra*, 16 Cal.5th at p. 637 [FEHA retaliation claim under § 12940, subd. (h), requires same showing of adverse employment action necessary for a discrimination claim under § 12940]; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1168 ["the [adverse] employment actions that can give rise to a claim for retaliation are *identical* to the actions that can give rise to a claim for discrimination"]; *Francis v. City of Los Angeles* (2022) 81 Cal.App.5th 532, 540–541 [to

---

[*] See footnote, *ante*, page 1.

prove claim of retaliation under Lab. Code, § 1102.5, "the plaintiff 'must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment'"]; *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1387, fn. 2, disapproved on other grounds in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718.)

"The phrase 'adverse employment action' does not appear in FEHA but 'has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute.'" (*Bailey, supra*, 16 Cal.5th at p. 637.) An adverse employment action is one that "materially affects the terms and conditions of employment . . . ." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1036 (*Yanowitz*).) "Although a mere offensive utterance or even a pattern of social slights by either the employer or co-employees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940[, subdivision ](a) (or give rise to a claim under section 12940[, subdivision ](h)), the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Id.* at p. 1054, fns. omitted.)

Beyond firing, demoting, or refusing to promote the employee, adverse employment actions also include actions by the employer that are "reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion . . . ." (*Yanowitz, supra*, 36 Cal.4th at pp. 1054–1055.) The type of adverse treatment that may be considered discrimination in terms, conditions, or privileges of employment is not "susceptible to a mathematically precise test . . . ." (*Id.* at p. 1054.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or

upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940[, subdivision ](a) and 12940,[ subdivision ](h)." (*Id*. at pp. 1054–1055, fn. omitted.)

**B. Constructive Discharge as Adverse Employment Action**

Plaintiff alleges that he was subjected to a materially adverse employment action for purposes of his discrimination and retaliation claims because BRS's conduct amounted to constructive discharge. """Constructive discharge, like actual discharge, is a materially adverse employment action.""" (*St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301, 315.) Thus, we first consider plaintiff's constructive discharge claim as constituting an adverse employment action supporting plaintiff's discrimination and retaliation claims.

"Employment relationships are generally terminated by resignation or discharge. [Citation.] An employee voluntarily severs the relationship by resignation; the employer does so by actual discharge." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244 (*Turner*).) "Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment." (*Ibid*.)

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather

than a resignation." (*Turner, supra*, 7 Cal.4th at pp. 1244–1245.) "Under the cases, an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id*. at p. 1246.) "'There appears to be no disagreement [in the cases] that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions.'" (*Id*. at p. 1247.)

The length of time an employee remains on the job after the onset of the alleged intolerable conditions "may be *one* relevant factor in determining the intolerability of employment conditions from the standpoint of a reasonable person," but "[n]either logic nor precedent suggests it should always be dispositive." (*Turner, supra*, 7 Cal.4th at p. 1254.) "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Id.* at p. 1247, fn. omitted.)

"Although situations may exist where the employee's decision to resign is unreasonable as a matter of law, '[w]hether conditions were so intolerable as to justify a reasonable employee's decision to resign is normally a question of fact.'" (*Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 827 (*Vasquez*), quoting *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056.)

Here, there are no allegations that plaintiff faced any additional harassment from Sanders after he returned to work, either in the workplace or outside it. When he discovered his work was hampered by his distress at the prospect of encountering Sanders in the workplace and his avoidance of her, plaintiff did not return to Carroll to seek a solution; he did not attempt to explain to her the difficulty and distress it caused

trying to stay away from Sanders given his work at her specific worksite; nor did he relate to Carroll that his distress and difficulty in this circumstance was conflicting with his ability to do his job. There are also no allegations that he requested any specific accommodation regarding contact with Sanders. Without attempting any additional remedies with his employer upon finding his work hampered, quitting was only one of the options available to plaintiff. (*Turner, supra*, 7 Cal.4th at p. 1246 ["The proper focus [for constructive discharge] is on whether the resignation was coerced, not whether it was simply one rational option for the employee."]; cf. *Vasquez, supra*, 222 Cal.App.4th at pp. 828–829 [constructive discharge where employer was repeatedly informed of employee's dire situation with respect to employer's violations of the Lab. Code and repeatedly refused to provide any solution].) Assuming the evidence supported plaintiff's allegations at trial, under these circumstances no reasonable trier of fact could find BRS "knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra*, at p. 1251.) As plaintiff's constructive discharge claim is not viable, there is no constructive discharge to constitute an adverse employment action with respect to plaintiff's discrimination and retaliation claims.

**C. Other Adverse Actions**

Plaintiff relies on *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994 (*Birschtein*) for the proposition an employer's failure to take adequate steps to prevent or end sexual harassment may constitute an adverse employment action because it ratifies the harassing conduct. BRS argues mere inaction in response to a complaint of harassment or discrimination does not constitute an adverse employment action; BRS also maintains *Birschtein* is inapt and, in any event, incorrectly decided.

As the reasoning for which plaintiff cites *Birschtein* deals with a retaliation claim, we turn there first. In the context of an analogous retaliation claim under section 1981 of

Title 42 of the United States Code, the Second Circuit Court of Appeals has held that "in a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." (*Fincher v. Depository Trust & Clearing Corp.* (2d Cir. 2010) 604 F.3d 712, 721.) The court reasoned "'[a]ffirmative efforts to punish a complaining employee are at the heart of any retaliation claim,'" and "[a]n employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint ...." (*Ibid.*) The court explained that a failure to investigate might be considered an adverse employment action if the failure is in retaliation for some separate, protected act by the plaintiff—for example, if an initial complaint allegedly resulted in a separate retaliatory failure to investigate a subsequent complaint. (*Id.* at p. 722.) For purposes of a retaliation claim under California law, the California Supreme Court has similarly held an employer's mere inaction or failure to take corrective action after a complaint of harassment is not, in itself, a retaliatory action. (*Bailey, supra*, 5 Cal.5th at p. 640.)

In *Birschtein*, the plaintiff worked on an assembly line at an automotive manufacturing plant. (*Birschtein, supra*, 92 Cal.App.4th at p. 997.) A coworker (Bonillia) asked her out several times, which the plaintiff declined; Bonillia then made comments to plaintiff that he wanted to "'eat her,'" and recounted detailed sexual fantasies he was having about her. (*Id.* at p. 998.) The plaintiff complained to Bonillia's foreman, who spoke to Bonillia about it. Bonillia stopped talking to the plaintiff, but he then started a campaign of staring at her while driving by her workstation very slowly. (*Ibid.*) The plaintiff complained to the assistant plant manager about the staring; following the complaints, Bonillia's staring lessened somewhat, but continued two or three times a week. (*Ibid.*) The employer investigated the plaintiff's complaints about Bonillia's staring in 1997 and again in 1999, but it did not take any disciplinary or

corrective action against Bonillia because the investigator felt it was unwarranted. (*Id.* at p. 999.)

In considering whether the plaintiff's claims of harassment and retaliation were actionable, the appellate court framed the underlying conduct: "[w]hat began as Bonillia's overt acts of sexual harassment (asking for dates, the 'eat you' remarks, his specifically sexual bathing fantasies) were later transmuted by [the] plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of *retaliatory* acts—the prolonged campaign of staring at [the] plaintiff—acts that were directly related to, indeed assertedly *grew out of*, the antecedent unlawful harassment." (*Birschtein, supra*, 92 Cal.App.4th at p. 1002.)

The appellate court subsequently rejected the employer's argument that the retaliation claim failed as a matter of law because there was no adverse action visited on the plaintiff by *management*. (*Birschtein, supra*, 92 Cal.App.4th at p. 1007.) The court relied on two Ninth Circuit Court of Appeals cases in the Title VII context for the proposition that an employer's failure to take action once it learns sexual harassment has occurred may amount to ratification of the prior harassment. (*Birschtein, supra*, at p. 1007, quoting *Fuller v. City of Oakland* (9th Cir. 1995) 47 F.3d 1522, 1529 & citing & quoting *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 880–882.) In conjunction, the court pointed out that FEHA, like Title VII, is to be construed in light of agency principles, and that a managerial failure to intervene effectively to prevent or end sexual harassment in the workplace by a coworker may amount to ratification of the misconduct. (*Birschtein, supra*, at p. 1007.) The court concluded that because Bonillia's conduct presented genuine issues of material fact that precluded summary judgment, the subsidiary issue of the effectiveness of the defendant's response was one that should "await further proceedings in the trial court." (*Ibid.*)

As we understand *Birschtein*, it reasoned that retaliatory acts taken by an employee in response to a coworker's protected activity (e.g., making a complaint) may

be imputable to the employer if the employer knows about the employee's retaliatory acts and fails to take action or encourages it, and could, therefore, potentially establish an adverse employment action by the *employer*. (See *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 213 ["[A]n employer may be held liable for coworkers' retaliatory conduct if the employer knew or should have known of the coworkers' retaliatory conduct and either participated and encouraged the conduct, or failed to take reasonable actions to end the retaliatory conduct."].) While *Birschtein* did not elaborate further on how Bonillia's staring conduct constituted an adverse employment action, we note the context of the plaintiff's retaliation claim is clearly distinguishable.

Here, unlike Bonillia's staring conduct, which occurred *after* the plaintiff complained, Sanders's underlying conduct *preceded* plaintiff's protected activity (his complaint). Sanders's conduct, even if imputable to BRS, could not constitute *retaliatory* conduct tantamount to an adverse employment action for the same fundamental reason outlined in *Fincher*: retaliatory conduct has to be in response to a protected activity. For similar reasons, Carroll's refusal to investigate or take any action on plaintiff's complaint is insufficient—an employer's mere inaction in the face of an employee's complaint does not constitute an act of retaliation. (*Bailey, supra*, 16 Cal.5th at p. 640 ["Had the City merely failed to further investigate Larkin's alleged harassment following [the plaintiff's] report of the same on January 29, no actionable retaliation would appear."].) In sum, neither Sanders's conduct nor BRS's failure to take action can be deemed retaliatory acts as a matter of law that constitute materially adverse employment actions.

However, plaintiff's allegations of adverse employment actions are not predicated only on Carroll's refusal to act on plaintiff's complaint; it is coupled with Giles's comment and social media post following plaintiff's complaint. (*Bailey, supra*, 16 Cal.5th at p. 640 ["purposeful obstruction" and "escalating threats" of HR manager could constitute adverse employment action in context of retaliation claim]; *Yanowitz, supra*, 36 Cal.4th at p. 1055 [considering the defendant's conduct collectively].)

In *Bailey*, after a coworker used a racial epithet referring to the plaintiff, the HR manager (Taylor-Monachino—who was friends with the harasser) initially failed to prepare a report of the underlying incident and, later, refused again when the plaintiff explicitly requested a report be filed. (*Bailey, supra*, 16 Cal.5th at p. 639.) She chastised the plaintiff for having told others about the incident and threatened that, by doing so, the plaintiff could create a hostile work environment for her harasser; when the plaintiff refused to drop the matter, Taylor-Monachino became hostile, ridiculing and rebuffing the plaintiff. (*Ibid.*) "Although ignoring, laughing at, and/or staring at [the plaintiff] might be considered mere social slights or ostracism in isolation, considered together and along with Taylor-Monachino's role [as HR manager], her treatment of [the plaintiff's] complaint, and her other conduct, they take on a different import. The hostility culminated in a confrontation on August 12, when Taylor-Monachino gestured at [the plaintiff] and mouthed the words 'you're going to get it.'" (*Ibid.*) The high court reasoned this course of conduct, undertaken by the HR manager, could support a jury's finding that Taylor-Monachino had effectively sought to withdraw the plaintiff's means of reporting and addressing workplace discrimination and harassment. The court reasoned further that withdrawal of an employee's "right to avail themselves of the HR process typically available to other employees materially affects the 'terms, conditions, or privileges' of their employment." (*Ibid.*)

Like Taylor-Monachino in *Bailey*, Giles was BRS's HR representative and, thus, her comments were not merely that of another coworker. However, materially distinguishable from *Bailey*, Giles's conduct amounted to two comments, not a course of conduct that reasonably could be viewed as aiming to foreclose plaintiff's ability to available himself of the HR process. Although upsetting and wrongly downplaying the seriousness of Sanders's conduct, Giles's statements are not sufficient for a reasonable jury to conclude that Giles was effectively precluding plaintiff from reporting and addressing workplace harassment. Plaintiff argues that considered collectively—BRS's

supervisor's refusal to take any action (Carroll) and publicly mocking his complaint (Giles) together forced plaintiff into a fearful, scorned and isolated position where he had to work alongside his harasser multiple times a week; and this materially affected his ability to perform his duties due to his fear and distraction. Yet, plaintiff did not encounter further harassment by Sanders after his complaint, nor did he return to Carroll or Giles to explain the difficulties he was facing or seek a specific accommodation in regard to working with Sanders, which Carroll and/or Giles then refused. In other words, it was plaintiff's internal distress compounded by the offensive message Carroll and Giles communicated that led him to avoid Sanders and hindered his job performance, not adverse employment actions on the part of BRS. (See *Torres v. Pisano* (2d Cir. 1997) 116 F.3d 625, 640 [feeling "'frightened'" and "'intimidated'" by employer's actions not an adverse employment action].) We are unable to conclude the allegations are sufficient to establish an adverse employment action by BRS necessary for plaintiff's discrimination and retaliation claims. (See *Bailey, supra*, 16 Cal.5th at p. 627 [FEHA discrimination claims address "'bias in the exercise of official actions on behalf of the employer'" whereas harassment claims focus on "'situations in which the *social environment* of the workplace becomes intolerable because the harassment … communicates an offensive message to the harassed employee'"].)

**III. Failure to Prevent Harassment Claim**[*]

The trial court also dismissed plaintiff's claim for failure to prevent harassment, discrimination or retaliation under section 12940(k). Such a claim requires a plaintiff to prove: (1) he or she was an employee; (2) subject to harassment/discrimination/ retaliation in the course of employment; (3) the employer failed to take all reasonable steps to prevent the harassment/discrimination/retaliation; (4) the plaintiff was harmed; and (5) the employer's failure to take all reasonable steps to prevent harassment/

---

* See footnote, *ante*, page 1.

discrimination/retaliation was a substantial factor in causing the plaintiff's harm. (CACI No. 2527; *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1312–1313 [§ 12940(k) creates a separate actionable tort enforceable upon the establishment of the usual tort elements of duty of care, breach of duty, causation, and damages].)

"Generally, [section 12940(k)] requires employers 'to take all reasonable steps necessary to prevent discrimination and harassment from occurring.' (§ 12940, subd. (k).) However, 'an actionable claim under section 12940, subdivision (k) is dependent on a claim of actual discrimination: "Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented."' [Citations.] Thus, 'where … a plaintiff cannot establish a claim for discrimination, the employer as a matter of law cannot be held responsible for failing to prevent same: "'[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen ….'"'" (*Miller v. Department of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 284–285.)

As plaintiff has stated a viable underlying claim for harassment, plaintiff's section 12940(k) claim is cognizable.[9]

## IV. Negligent Hiring, Supervision or Retention[*]

"[A]n employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee" where "the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." (*Capital Cities, supra*, 50 Cal.App.4th at p. 1054.) Plaintiff claims that BRS was negligent in hiring, supervising, and/or retaining Sanders, Giles and Carroll

---

**9** Plaintiff's cognizable harassment claim is based, in part, on BRS's failure to take any action in response to his complaint and, thus, the nature of these two claims overlaps.

***** See footnote, *ante*, page 1.

because BRS "knew or should have known that" these employees were "unfit, and that this unfitness created a particular risk to others." These boilerplate legal conclusions about BRS's knowledge are insufficient to allege a cause of action. (*O'Grady v. Merchant Exchange Productions, Inc.* (2019) 41 Cal.App.5th 771, 777 ["we are not bound to respect a pleader's 'legal characterization' of events or transactions"].) Although less specificity is required in pleading matters of which the defendant has superior knowledge (including matters such as a defendant's knowledge or notice of intent), there must be some *factual* basis for the assertion BRS knew or should have known of the unfitness of its employees. (*Capital Cities, supra*, at pp. 1054–1055 [explaining negligent hiring, training and supervision claim must be supported by facts articulating *how* the defendant knew or should have known the employee created a particular risk of harm that actually materializes].) The absence of those facts is fatal to the claim. (*Rincon Band of Luiseño Mission Indians etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1112 [conclusory allegations merely parroting legal elements of a cause of action are not sufficient to state a claim].)

## V. Conclusion

In sum, plaintiff has stated a cognizable sexual harassment hostile work environment claim and for failure to prevent harassment, and the trial court's ruling sustaining BRS's demurrer as to these claims is reversed.

As for the remaining claims, the circumstances of plaintiff's resignation were not tantamount to constructive discharge, rendering plaintiff's constructive discharge claim insufficient as a matter of law. As plaintiff was not constructively discharged, his resignation does not constitute an adverse employment action in the context of plaintiff's discrimination and retaliation claims. Moreover, no other conduct rose to the level of an adverse employment action necessary for those claims. Finally, plaintiff's negligent hiring, supervising and retention claim does not sufficiently state a claim. As such, the trial court's ruling on BRS's demurrer is affirmed with respect to these claims.

## DISPOSITION

The judgment is reversed in part and affirmed in part. We reverse the trial court's rulings sustaining BRS's demurrer as to plaintiff's claims for sexual harassment hostile work environment and for failure to prevent harassment. We affirm the ruling sustaining BRS's demurrer as to plaintiff's remaining claims for sex/gender discrimination and retaliation in violation of FEHA; retaliation in violation of Labor Code section 1102.5; constructive termination in violation of public policy; and negligent hiring, supervising or retention.

For purposes of clarity, plaintiff shall amend the complaint to present his allegations under the theory of hostile work environment sexual harassment, consistent with this opinion, that we have found viable. Plaintiff's amendment may include additional allegations regarding the imputability of Carroll's and Giles's actions to BRS under the relevant standard.

In the interest of justice, each party shall bear their own costs on appeal.

MEEHAN, J.

WE CONCUR:

FRANSON, Acting P. J.

SNAUFFER, J.